William T. Marshall
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
*Attorneys for Plaintiff Susan J. Galli*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUSAN J. GALLI<br><br>          Plaintiff,<br><br>    against --<br><br>PRICEWATERHOUSECOOPERS LLP NOTICE/SEVERANCE POLICY As Amended and Restated Effective February 1, 2011; PRICEWATERHOUSECOOPERS LLP; PRICEWATERHOUSECOOPERS ADVISORY SERVICES, LLC; JEFFREY LAVINE: CATHERINE STAHLMANN; MARIA CALABRESE; CHERYL RIPORTI; THOMAS KOVELL; COURTNEY MOORE;<br><br><br><br>          Defendants. | Docket No. 19-cv-07224 (LGS) (SN)<br><br><br><br>**AMENDED COMPLAINT** |

Plaintiff Susan J. Galli ("Galli" or "Plaintiff"), by her attorneys, Zeichner Ellman & Krause LLP, alleges for her Amended Complaint against defendants PricewaterhouseCoopers LLP Notice/Severance Policy, As Amended and Restated Effective February 1, 2011 (the "Policy," "Plan," or "PwC Severance Plan"); PricewaterhouseCoopers LLP ("PwC"), the Plan Sponsor and Administrator; PricewaterhouseCoopers Advisory Services, LLC ("PwC Advisory

Services"); Jeffrey Lavine; Catherine Stahlmann; Maria Calabrese; Cheryl Riporti; Thomas Kovell and Courtney Moore, employees and purportedly fiduciary designees on behalf of the Policy Administrator:

## I.    NATURE OF THE ACTION

Plaintiff seeks relief in this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., including §§ 502(a)(1)(B) and 502(g)(1) (29 U.S.C. § 1132(a)(1)(B)), 29 U.S.C. § 1132(A)(3), §502(a)(3)); 29 U.S.C. § 1132(g)(1); § 503 (29 U.S.C. § 1133)); § 510 29 U.S.C. 1140; and §§ 404-406 and §409 (29 U.S.C. §§1104-1106 and 1109: to recover benefits to which she is entitled under the Plan; injunctive relief as may be permitted and appropriate under the plan, plus attorneys' fees and costs.

## II.    THE PARTIES

1.    Plaintiff Susan J Galli is a citizen of the State of Florida who, in the Spring of 2014, was aggressively recruited and hired by PwC, beginning on or about August 4, 2014 to serve as a Managing Director, as one of three leaders, in its Anti-Money Laundering (AML) Advisory unit.

2.    At the time, Galli was employed by a global bank and was an experienced and accomplished Anti-Money Laundering subject matter specialist, having served in the financial services industry for over 27 years.

3.     PwC terminated Galli from employment with PwC's AML Advisory unit which, effective April 7, 2017, upon information and belief, was part of a wholly-owned subsidiary of PwC, and to which she had been transferred about July of 2015, without any explanation.

4.     PricewaterhouseCoopers LLP ("PwC" or "Firm") is a limited liability partnership formed under the laws of the State of Delaware.

5.     PwC is engaged in the Certified Public Accounting business and related businesses, with its headquarters at 300 Madison Avenue, New York, New York 10017.

6.     Upon information and belief, PwC is one of the "big four" U.S. public accounting firms and is a member of a worldwide network of firms through which it conducts interstate and international business and commerce.

7.     The Defendant PwC's Severance Plan represents itself to be an ERISA welfare benefit plan created and administered by PwC and filed with the United States Department of Labor.

8.     Upon information and belief, Defendant Courtney Moore ("Moore") is employed by PwC in its Human Capital Operations at PwC in its office at 1 North Wacker, Chicago, Illinois 60606.  Moore was delegated by PwC to act as a fiduciary in deciding claims asserted by Galli in January 2018 under the Plan although PwC did not produce documents to Plaintiff requesting proof of

same.

9.      Upon information and belief, Defendant Thomas Kovell ("Kovell") is an employee of PwC, a Human Capital Operations Leader in PwC's office at 2001 Market Street, Philadelphia, Pennsylvania 19103.

10.      Similarly, though requested by Plaintiff, PwC did not produce adequate information proving Kovell's credentials to Galli.

11.      Mr. Kovell was apparently delegated to be the fiduciary by PwC in deciding an appeal made by Galli in June 2018 from a previous denial of her benefits in a decision issued by Defendant Moore in April 2018.

12.      PwC Advisory Services, LLC is an enterprise formed in Delaware by PwC and activated to do business in New York, New York in 2015.

13.      Jeffrey Lavine ("Lavine") at relevant time was, and upon informtion and belief still is, a partner of PwC, to whom Plaintiff reported.

14.      Catherine Stahlmann ("Stahlmann") at relevant times was and upon information and belief still is, a "principal" of PwC.

15.      At relevant times, Defendant Maria Calabrese ("Calabrese") at relevant times was and employee in PwC's Human Resources Department.

16.    At relevant times, Defendant Cheryl Riporti ("Riporti") was an employee in PwC's Human Resources Department.

### III.    JURISDICTION AND VENUE

17.    This Court has jurisdiction to hear and determine the matters set forth herein pursuant to the provisions of ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and § 503 (29 U.S.C. §1133).

18.    Venue is proper within the Southern District of New York pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(2) because PwC is headquartered in this Judicial District and a substantial portion of the events/omissions giving rise to the claims occurred within this Judicial District as Galli was, herself, assigned to the New York office.

### IV.    FACTS COMMON TO ALL CLAIMS

**PwC's Fraudulent Deception of the New York Banking Department**

19.    This case has roots going back to the financial crisis of 2009. In or about or before 2008, PwC made a tragic and calculated decision to risk its entire business reputation by engaging in a conspiracy with a banking client to deceive and defraud both U.S. Government and New York State banking regulators which had been investigating one of PwC's bank clients  for possible violations of U.S. and New York banking laws and Anti-Money Laundering and Office of Foreign Assets Control ("OFAC") sanctions laws, rules  and regulations.

20.     The investigation involved actions by the bank unlawfully clearing about 28,000 transactions worth about $100 Billion between 2002 and 2007 involving foreign entities suspected of Money-Laundering, sanctions evasion and other crimes.

21.     The bank hired PwC to analyze the transactions and develop an Historical Transactions Report (HTR) to present to the regulators to assess the severity of the suspected violations by the bank. The banking regulators apparently agreed to accept and rely on the findings of PwC in the HTR.

22.     PwC personnel were present at a presentation to the regulators by the bank and then, or shortly thereafter, discovered that the investigation was more serious than anticipated, and that a forensic review should have been recommended by PwC.

23.     However, motivated by profit and in order to curry favor with its client, PwC acceded to the request of the bank and knowingly disregarded that the regulators had also become "clients" of PwC for purposes of its assessment in the HTR.  PwC agreed to make false and deceiving changes to the HTR, as requested by the bank, to affect the outcome of the regulators' decision as to what fines or sanctions might be appropriate for the bank.

24.     The bank was eventually fined by DFS in the amount of $250,000,000 for its role in clearing the transactions involving sanctioned entities.

25.    In 2013 and 2014 DFS conducted a subsequent investigation into PwC's role in the cover up as a result of the falsified HTR.

26.    The investigation was settled by an Agreement in August 2014. The bank was fined an additional $350,000,000 and PwC was fined in the amount of $25,000,000, apparently the largest fine ever levied against a financial services advisory firm. In reality it was a minimal portion of PwC's income for 2014, which, upon information and belief, was approximately $34 billion[1] and made PwC the sixth largest private company in America on the Forbes list.

## PwC's Fraudulent Inducement of Susan J. Galli

27.    While the investigation of PwC was going on, its Partner Jeffrey Lavine and Principal Catherine Stahlmann began recruiting Plaintiff in May 2014. They told her that PwC wanted to hire her as an experienced catalyst hire to elevate its profile in the area of financial crimes compliance; that it had been neglecting its marketing and practice development initiatives; that she was being hired because of her high profile in the AML community and her extensive network of contacts; and that PwC wanted her to provide it with greater visibility at key industry conferences and raise the Firm's profile in financial crime compliance. In other words, she was hired because of her "brand" in the industry.

---

[1] The Forbes List of America's Largest Private Companies, 2014.

28.     Lavine and Stahlmann never disclosed to Galli the material fact that the DFS investigation was targeting the very unit (Regulatory Advisory Services of "RAS") she was being hired for, and the almost certainty that it was going to be severely sanctioned, and most importantly, the negative consequences this would pose to Plaintiff personally.

29.     PwC's offer of employment to Galli was made under false pretenses.  The Firm offered her an attractive compensation package to lure her into leaving her secure and very senior global position with a large global bank and foregoing other opportunities, but only provided an "at will" agreement with a three-month termination notice.

30.     They put intense pressure on her to join as soon as possible, likely knowing that a settlement with the DFS was imminent, and that she would probably choose to go elsewhere, if she knew about the conditions of the settlement.

31.     Clearly, had she known of the regulatory problem, she most certainly would not have signed that contract, and would have hired a lawyer or most likely would have stayed where she was or would have pursued one of the other consulting opportunities for which she was being sought.

32.     She would not have agreed to the arbitration agreement; the overly broad, non-competitive restrictive covenants; the waiver of her right to a

jury trial; as well as her right to participate in a class or representative action, among other things.

33.     In fact, having noticed that PwC had a separate AML technology unit which was part of its Risk Assurance line of service, at that time she specifically asked Jeffrey Lavine, the PwC partner in the AML Risk Advisory Services ("RAS") unit that was part of the Advisory line of business, if that factor would pose any internal competition to her and the advisory practice in terms of competing for clients.

34.     Mr. Lavine assured her that it would not because, he told her, the technology practice area of PwC did not have the subject matter knowledge or the experience to handle the advisory work handled by the RAS AML Advisory practice, and untrue statement.

35.     In reliance on this representation and assurances from Lavine and Stahlmann, Galli decided to join the Firm and signed her Employment Agreement ("Agreement") with PwC on June 11, 2014.  Mr. Lavine knew or should have known of the current DFS investigation and factual circumstances of a pending settlement because he was a partner and the practice leader of the unit being investigated, and was also at the firm at the time the wrongdoing occurred so would have most definitely been potentially targeted by the investigation.

36.     Lavine and Stahlmann continued to deceive her for the next

two months as she was preparing to join PwC, while its settlement negotiations with the DFS were progressing. When she did arrive at PwC on or about August 4, 2014, PwC still had not told her of the DFS investigation.

37.     In fact, she learned of the investigation and the Settlement Agreement not through PwC, but through the media on or about August 17, 2014, when it became effective and public.  Her first day on the job in the New York office after her initial two-week training was Monday August 14, 2014.

38.     Concerned about this material development, Galli approached Jeff Lavine to discuss whether she could be transferred to another practice area of the Firm.  Part of the settlement agreement with DFS included a provision that made all of the employees of the RAS practice, including Plaintiff a subject to the settlement agreement.  PwC agreed to a two-year ban that solely impacted the PwC RAS practice unit but no other practice areas of the firm.  This meant that RAS employees, including Plaintiff, would be hindered in their ability to do work for DFS-regulated banks.  The ban prohibited said employees from acting as independent consultants for DFS regulated banks or to have access to Confidential Supervisory Information ("CSI") for DFS-regulated clients for all new engagements.

39.     Plaintiff clearly understood the potential implications of the sanctions being imposed against her and immediately requested a transfer but

Lavine told her she could not be transferred, and that he would not do so because her name, without her knowledge or approval, had been submitted with others to the DFS as employees working in the RAS unit who would be bound by the sanctions, even though the vast majority of these individuals were not at the firm when the fraudulent report was issued back in 2008.  He said that the Firm might look bad in the eyes of the DFS and might question her transfer, if he were to do so.

40.    This statement was also false as the Settlement Agreement itself suggests; there was no impediment in it to prevent PwC from moving her to another unit, particularly since she was a new employee with no nexus to PwC's sanctioned conduct. In fact, there was a provision in the Settlement Agreement providing for regular dialogue between PwC and DFS.

41.    Galli was very concerned about the fact that she had not been told prior to joining about a very special material regulatory development and that the submission of her name had been done without her prior knowledge and permission.  Mr. Lavine told her and other employees of the AML Advisory practice that they should not be concerned because it was only a two-year ban and that it did not pertain to assignments in place at the time of the ban.

42.    He also assured the team that there were enough assignments at PwC which were exempt from the ban to carry the unit (and, therefore, the team)

through its expiration in August, 2016.   Based on those representations and assurances, she continued in her job and proceeded to do everything reasonably asked of her.   Again, his representations proved to be false and Lavine, as the head of the unit, knew or should have known it.   Lavine's assurances and guarantees were not honored.

43.   It is well documented that Plaintiff had a banner FY2015. She was rated a "high performer" and was pegged as a leadership champion for PwC's talent transformation process that it had rolled out in 2015.

44.   She received her promised 2015 bonus in the amount of $100,000 but PwC overlooked her eligibility for a merit raise.

45.   But things abruptly changed for Plaintiff at the beginning of the FY2016 performance year.   Bizarre things happened and PwC adopted and acted out a culture not only adverse to the law, but to its own code of conduct and those required by the standards of the accounting profession.

46.   In the Spring of 2015, about nine (9) months into its two-year ban imposed by DFS, PwC had registered PwC Advisory Services, LLC, a Delaware entity, as a company doing business in New York and later transferred

all U.S. Advisory personnel into this entity without prior notice or explanation.[2] Employees were eventually told that they had been moved into a new legal vehicle, since their paychecks were now coming from a new company, but were never asked to re-execute employment agreements with the new employer entity.

47.     At or about the same time, PwC formed a new unit bringing together several disparate practice areas that all were doing various aspects of Financial Crime advisory work and called the new unit the Financial Crimes Unit "FCU"). They also formed an internal "joint venture" between the FCU and the AML technology unit in the Risk Assurance line of service.

48.     Plaintiff was, on several occasions, told by PwC's risk partners that she could not work on specific projects due to the two-year ban, and Lavine put her on other projects as an "investment" to win other work from a potential client, which typically meant she would not earn any credit for utilization or revenue generation.

49.     She was also removed from or passed over for jobs in favor of younger male partners or disallowed from billing her time on other jobs so as not to negatively impact the margin on these projects. All of this is against PwC's

---

[2]   This LLC was formed under the laws of the State of Delaware in February 2014, while the DFS investigation of PwC was progressing and registered in the State of New York in April 2015. Upon information and belief, PwC, which was a party and bound by the Settlement Agreement, never informed the DFS of the Firm's reorganization of the joint venture between the LLC and the AML technical unit; or the formation merger into the Fraudulent Crimes Unit.

policies.

50.     In May of 2016, just prior to her annual review, Lavine asked her what her future plans were, suggesting that she might like to retire. She pushed back and told Lavine she had no intention of retiring early.

51.     The results of her annual evaluation were not communicated to her until the end of July, nearly a month and a half late,  and eventually she was downgraded from a high-performer to a "needs improvement" rating which disqualified her from any bonus.  At this meeting, Lavine told her that he was sorry that he had to make this review about performance, but that is apparently the marching orders he was given after Galli indicated that she was not ready to retire, as she was several years shy of being eligible for social security benefits.  It is noteworthy that PwC requires its partners to retire at age 60, but it also appears that PwC is quietly extending this requirement to Managing Directors and Directors, without their agreement. Partners who retire at 60 do so with full health care benefits and a pension.  Managing Directors and Directors on the other hand, are treated as any other employee, and immediately lose their health care benefits and may or may not receive their severance benefits apparently at the whim of the PwC Plan trustees.

52.     It appears that Galli's performance rating was based solely on utilization and revenue generation metrics, and did not, as was required by PwC's

performance evaluation system, take into consideration any of the performance snapshots or other performance indicators which were all very good and other performance goals that Galli had attained throughout the year or any of the other initiatives that Plaintiff was leading on behalf of the practice, most of which had been assigned to her by Lavine.

53.     This was also contrary to the assurances that Lavine had made when the DFS two-year ban was announced.  He had indicated that the restrictions on RAS employees would not personally negatively impact them, but this was clearly not the case.  Galli went from being a "high performer" in 2015 to a "needs improvement" performer in May 2016, while the DFS ban was still in full force and effect.

54.     All of these facts form just a part of the abuse inflicted on Plaintiff by PwC and justify Galli's claim under §§ 5(c) and (d) of the Plan.  They also discredit any statements by Lavine and Stahlmann.

**Lavine's Subtle Warning of Possible Termination**

55.     On January 26, 2017 Lavine, whom Galli had not seen for some time, requested that she come to his office.  She obliged and started to update him on some of the proposals that had been outstanding prior to the holiday break.  He interrupted her and told her that "he could no longer defend her".  He indicated that the firm had been making cuts and that two of the female Directors in the RAS

practice area would be departing at the end of February.

56.     He indicated that some of the other male partners also wanted her to be on that list, but at no time at this meeting did he indicate that she was being given Notice of a Covered Termination or that April 7th would be her last day at the firm.  To the best of her knowledge and recollection, he never used the word "termination" or "notice" and never even said or suggested a date.

57.     Instead, he said he would like to have another meeting with her and someone from Human Resources on February 1, 2017 to discuss things further before she left for her planned vacation on February 10, 2017.

58.     Plaintiff was at the office on the February 1, 2017 to attend the meeting, and later learned that Lavine was out of the country on business.

59.     Galli heard nothing further from him about possible termination, although she was obviously concerned that this could eventually occur since it was common knowledge that a number of other Managing Directors and Directors across the firm were being cut on a monthly basis.  Every month a few more would disappear without any kind of official notice about layoffs.

60.     Before returning from her vacation, she was contacted by Catherine Stahlmann to advise her that Lavine had approved her to work on a new project with a major global client that she had helped to win and that, essentially, she was the only subject matter specialist with the necessary business experience

to carry out the project.  There was no discussion about an imminent departure.

61.     PwC would not have been selected to do the work without Plaintiff's involvement.  Plaintiff figured that no news was good news, and continued to carry out her duties, as there was no further communication from Lavine to follow up on the January 26 meeting.

62.     Plaintiff and Stahlman never spoke about "termination" and Stahlmann never revealed to her that she had been at a meeting with Lavine and others discussing a strategy to terminate her.

63.     On March 7, 2017, Ms. Galli spoke briefly with Catherine Stahlmann, at a conference in Florida.  Stahlmann, who had been with her in Germany the prior week or so, asked her how she was doing and inquired whether she had been in contact with Jeff Lavine.  Ms. Galli replied that she had not heard from him.

64.     Within hours of her having spoken to Stahlmann, she received a strange email from Stahlmann with no message but only an attachment of what looked like a draft letter that was unsigned and bearing the date February 27, 2017, which referred to an April 7 termination date.  That draft, or a final version of same, was never sent to or received by Ms. Galli from the author, nor did the author sign it. It apparently had been composed by Maria Calabrese in Human Resources and, on its face, was not factually accurate because Ms. Calabrese was not at the January 26, 2017 meeting, and, therefore, had no idea

what was discussed at that meeting.  Mr. Lavine did not take any notes during the January 26, 2017 meeting.  Maria Calabrese also did not meet with Ms. Galli and Mr. Lavine on February 1, 2017 or at any other time to discuss the terms of a termination of Ms. Galli.

65.     The letter incorrectly stated that the terms outlined in the letter had been discussed when Ms. Galli met with Mr. Lavine on January 26th, which was not the case.  In fact, none of those details were ever discussed with Jeff Lavine, even when Ms. Galli met with him on April 4th.

66.     Galli never received or saw the final version of that letter, only the draft when she received it from Catherine Stahlmann's iPhone.

67.     Maria Calabrese never sent a final, signed version of the letter to Ms. Galli.

68.     The next time Ms.Galli saw or heard from Mr. Lavine was on April 4, 2017 (three days before her actual termination) while they were both attending an industry conference, which Mr. Lavine also had asked Ms. Galli to attend, representing PwC.  He appeared unaware, that Ms. Galli would have been attending the conference anyway, as she is a member of the Advisory Board for the conference organizer, and was speaking on number of panels at the conference.

69.     During her discussions with Mr. Lavine on that date, he never discussed or even raised a Notice Period (for severance pay purposes) or, for that

matter, her Termination Date, although he did mention to her that if she were to decide to go out into business on her own, she would be free to do so, because the Firm would not seek to enforce the restrictive covenants in her Employment Agreement, whereas PwC would not like or be receptive to her working for another competitor firm. It is noteworthy, that these assurances provided by Mr. Lavine were not consistent with the Separation Letter received the following week, purportedly from Mr. Lavine. He also never responded to several emails that Ms. Galli sent to him trying to identify specifically which clients PwC felt were covered by the restrictive non-solicitation clause.

## V.   PwC NOTICE/SEVERANCE PLAN

70.   The PwC Notice/Severance Plan purports to be a "welfare benefit plan" within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, meaning that it provides benefits to an "Eligible Employee" who experiences a "Covered Termination."

71.     PwC is both the sponsor and Administrator of the Plan and delegates its administrative duties to certain designees. "Administrator" is defined as PwC acting in its capacity as "administrator" within the meaning of Section 3(16) (A) of ERISA.

72.     Section 1 of the Plan specifically states that the purpose of the Plan is to "provide Eligible Employees…with notice of, and/or severance pay upon termination by the Firm "for reasons other than professional, legal, ethical, or Firm policy violations."

73.     Section 5 (a)(i) provides that "[e]ach Eligible Employee who incurs a Covered Termination <u>shall</u> receive such <u>prior</u> Notice Period…as specified in his or her Employment Agreement." [emphasis supplied].

74.     The "Notice Period" is defined in Section 2(g) of the Plan and means "the period, if any, of <u>notice of a Covered Termination to which an Eligible Employee is entitled pursuant to Section 5(a)</u>" of the Plan. (emphasis supplied).

75.     The Plan defines "Covered Termination" as an Eligible Employee whose employment is terminated by the Firm for reasons other than professional, legal, ethical, or Firm policy violations.

76.     Defendants admit that Galli is an Eligible Employee, because at relevant times she was an employee of the Firm and was not one which falls within any of the nine exclusions listed in § 2(b) of the Plan.

20

77.     Defendants also admit that there is no dispute that Ms. Galli's dismissal is a "Covered Termination" under the Plan, because it was not the result of any professional, legal, ethical, or Firm policy violations by Ms. Galli herself (Plan, Sections 1 and 4(a)), and it does not fall within any of the specific exclusions in Plan Section 4(b)(i) through (iii).

78.     It is undisputed that Galli, who was employed by the Firm from August 4, 2014 through April 7, 2017 was entitled to a three months' Notice Period prior to her termination under Section 5 of the Plan.

79.     PwC has not disputed that Ms. Galli's dismissal is a "Covered Termination" under the Plan, because it was not the result of any professional, legal, ethical, or Firm policy violations by Ms. Galli herself (Plan, Sections 1 and 4(a)), and it does not fall within any of the specific exclusions in Plan Section 4(b)(i) through (iii).

80.     The Plan provides in Section 6 that payment of severance benefits is to be made in a lump sum. But instead of receiving a lump sum of $105,000, less withholdings, PwC subsequently only paid her the equivalent of $31,907, representing her base pay for the period from April 7, 2017 through the last pay period of April 2017.

## VI.   <u>PROCEDURAL HISTORY</u>

81.    PwC hired Plaintiff as a Managing Director on August 4, 2014.   It terminated her from employment on April 7, 2017. Following her termination, Plaintiff received in the mail an unsigned letter dated April 7, 2017 confirming her termination and containing within it a proposed Agreement and General Release ("A & R") in favor of PwC, its subsidiaries, partners, principal, and employees ("Termination Letter").

82.    Galli sought advice of legal counsel, which the Termination Letter suggested she do before signing, and she ultimately refused to sign the proposed A & R in the Termination Letter on the grounds it lacked adequate consideration because she had numerous statutory and common law claims for damages against PwC, including some of its partners and/or principals; and because the A & R did not adequately provide her with the severance to which she was entitled under the PwC Severance Plan and attempted to place conditions on the severance payment.

83.    Although the Termination Letter made no mention of the PwC Severance Plan, it was transparent to Plaintiff that PwC was using the payment of benefits under the Plan as leverage, or a wedge, to obtain a full release from all possible wrongdoings, such as fraudulent inducement; intentional infliction of emotional distress; intentional interference with business opportunity through attempting to enforce a two-year non-solicitation by Galli of PwC's clients

and employees and by defamation; and discrimination based on age and gender.

84.     Payment of the full amount of severance referenced in the letter was contingent on signing the A & R.

85.     It was also apparent that, in an effort, to try to intimidate her for refusing to sign the A & R, PwC was "slow walking" payment of her final authorized travel and entertainment expenses which caused her corporate credit card account to become delinquent, as well as not providing her with requested information about the PwC Notice/Severance Plan.

86.     Upon information and belief, Galli had never been provided with a copy of the Plan, or even its Summary Plan Description, during the entire time she was employed by PwC, although the Policy had been mentioned in an Employment Agreement she was required to sign on June 11, 2014 before joining the firm.  She had asked Human Resources for a copy several times after her departure and was told that the Severance Plan was included in her employment letter.

87.     After much haggling with PwC, it refused to respond to Plantiff except through its local counsel. Thus Plaintiff hired counsel and obtained a copy of the Plan only after her attorneys demanded a copy of same from PwC.

88.     Thereafter, Galli sought, through her attorneys, to resolve the dispute over payment of her severance under the Plan, including the exchange of

extensive correspondence with PwC's counsel, setting forth the facts and circumstances of Galli's claims against PwC, to no avail.

89.     As to severance benefits, Galli provided PwC with extensive facts and circumstances supporting her claim that she had not received the requisite Notice of her Covered Claim and Notice Period under § 2(g) of the Policy.

90.     She did the same as to her other claims which formed the basis for a claim under §§ 5(c) and (d) of the Plan.

91.     PwC disregarded Plaintiff's submissions and asserted the alternate defense that Galli had "actual notice" of her impending termination, which PwC claims satisfied the "Notice Period" requirements in the Policy. However, they have produced no substantive evidence to support its position.

**Galli's Claim For Benefits**

92.     On January 18, 2018 Galli's attorneys made a formal claim on her behalf, in two parts: (a) Policy § 5 (b) (Severance Pay in Lieu of Notice), and (b) §§ 5(c) (Firm's Discretion), and 5(d) (Limitation).

93.     That is, in addition to the severance pay in lieu of the Notice Period claim, pursuant to the Policy's § 5 (b), Plaintiff requested supplemental benefits pursuant to Sections 5(c) and (d) of the Plan which permitted PwC, in its sole discretion, to make additional payments, over and above the "Pay" benefit defined in the Plan, for amounts totaling up to 200% of the Eligible Employee's

total annual compensation for the year prior to the year of termination, in this case FY 2016.

94.    The Plan provides that payments within PwC's discretion under Sections 5(c) and (d) can be made "in such form, at such times, and on such terms and conditions as the Firm may determine," *e.g.*, severance pay, notice, and/or benefits.  This meant that Ms. Galli, who was terminated on April 7, 2017, was eligible to receive <u>discretionary</u> payments in an amount in excess of $1,000,000, depending on the value of her benefits as a percentage of her annual "total compensation" for FY 2016.

95.    On April 11, 2018 Defendant Courtney K. Moore ("Moore") issued a terse decision summarily denying Galli's January 18, 2018 formal claim for benefits under the Plan. No decision was rendered by PwC or any Administrator or fiduciary pertaining to the claims made under Sections 5(c) and (d) of the Plan. These claims were simply ignored.

96.    On June 6, 2018, Galli's counsel filed an appeal from, and made a comprehensive request for documents and information, directed to Ms. Moore and to the Human Capital Operations Leader in Tampa Florida, as directed in the Policy in connection with, the Initial Determination and the appeal itself.

97.    On June 29, 2018, PwC's counsel responded by sending only three documents in response to the requests, one of which appears to have been an

incorrect IRS Form 5500 Annual Report for a different Policy.

98.     On July 19, 2018, in response to Galli's June 6, 2018 request in the appeal for documents, the same counsel sent only a few additional documents, mostly incomplete emails to support the issue of whether Galli received a "Notice Period" of a "Covered Termination," as required in Section 2 (g) of the Plan.

99.     With the exception of one email dated January 31, 2017, which was out of context to support PwC's claim that notice of termination was given to Galli on January 26, 2017 which sufficed to satisfy the Plan, even though Galli had never seen the Plan prior to her termination.  The other emails produced were out of sequence (dated in March 2017).  In all, the production by the PwC Administrators was a small fraction of what had been requested.

100.     On August 2, 2018 Galli and her undersigned counsel received a Final Determination Letter dated August 1, 2018 by Thomas Kovell, an employee of PwC in its Philadelphia, Pennsylvania office, which adopted and affirmed Moore's April 11, 2018 Initial Determination. In many respects, this Final Determination merely "rubber stamped" some of the summary findings in the Initial Determination, without reason or sufficient evidence, and those based on pure hearsay and incorrect information.

101.     The Final Determination was devoid of any evidence that

Galli's claim received Notice of a "Covered Termination" under Section 2(g) of the Policy.

102.   As to the supplemental claim pursuant to §§ 5(c) and (d), it too was totally ignored by the Defendant Kovell in the Final Determination.  He did not make the slightest attempt to rectify the omission by Defendant Moore.

103.   Hence, there are no findings or reasons for the denial of the §§ 5(c) and (d) claim in either the Initial Determination or the Final Determination for such claim, based on fraudulent inducement, intentionally tortious acts, defamation, discrimination based on age and gender and the like, as specified at length in correspondence between Galli's and PwC's attorneys.

104.   The Final Determination confirmed that Plaintiff had exhausted her administrative remedies under the Policy and ERISA and that she had the right to bring an action to challenge the adverse benefit determination within six (6) months of receipt of his letter, which was incorrect.

105.   By letter issued on or about January 25, 2019, Defendant Kovell corrected the Final Determination to state that Plaintiff has one year from receipt of his Final Determination Letter by which to commence an action challenging it.

VII.   **CLAIMS FOR RELIEF**

**COUNT ONE**

**ERISA§503, 29 U.S.C.§1133**
**(FAILURE TO PROVIDE A FULL AND FAIR REVIEW OF ERISA**
**CLAIM)**
**(DEFENDANTS PWC, MOORE AND KOVELL)**

106.   Plaintiff repeats and realleges paragraphs 1 through paragraphs 105 as if fully set forth herein.

107.   Both the Initial or Final Determination are procedurally and substantively flawed.

108.   There was an inherent conflict of interest for PwC because it is both the Sponsor and the Administrator of the Plan.

109.   The Plan is not funded and all payments of claims which are allowed are made by PwC from its general assets. Hence, a denial of claims directly affects the bottom line of the Sponsor, PwC, and likewise the earnings of the Partners and principals as owners.

110.   PwC delegated its fiduciary duties under the Plan to its employees, Moore and Kovell, whom were on PwC's payroll and whom the Firm tightly controlled. This, these individuals lack the independence and objectivity to make fair and impartial decisions.

111.   Upon information and belief, Defendant Moore was apparently spoon-fed the information from some of the individuals who are now defendants and were involved in the termination of Galli.

112.   Defendant Kovell, in rendering his decision, upon information and belief, gave it a superficial review, and adopted the conclusory findings of Moore and PwC who, in 2017 made a adverse determination in the April 7, 2017 letter, and in prior writings, based on a blatant falsehood.

113.   They were both influenced by Defendants Calabrese and Riporti, who were not present at the January 26, 2017 meeting between Galli and Lavine and relied on rank hearsay.  In fact, if a conversation were to take place to provide notice or actual termination of an employee,  it would be standard policy to have an individual from human resources present at such a meeting, and to document this action in writing.

114.   In addition, both the delegated fiduciaries, Moore and Kovell shared the same attorneys as those representing PwC which allowed them to be in lock step with the interests of the Sponsor, PwC.

115.   Hence, there was an inherent and serious conflict of interest.

116.   This is evident from Defendant Riporti's email memorandum dated March 27, 2018 to Defendant Moore, providing her (and subsequently Defendant Thomas Kovell) with information for her determination and indicating

she was "connecting" with Sheinfeld (referring to Stephen Sheinfeld, Esq., of Winston & Strawn), counsel for PwC, the Sponsor, as well as the Administrator, is a case in point evidencing a biased (or rigged) conflict of interest.

117.    The Administrator, though its agents, did not cooperate in providing documents and information requested by Galli through her counsel Galli made a request for documents and information at the time the appeal from the Initial Determination was issued.  One of the responses was late, beyond the 30-day widow to produce same. The documents were sent shortly before the Final Determination was issued on August 1, 2018. Although a few of the requested documents were sent, essentially there was non-compliance with document production on the part of PwC. A few of the documents sent to Galli were also incorrect.  There is a paucity of responses, except as to documents which arguably favor PwC.

118.    This was prejudicial to Ms. Gallo since she was required to return her laptop and other information as soon as she left her employment with PwC and was immediately cut off from PwC systems. Thus she was unable to access these documents or her own emails that were sent through PwC systems unless PwC supplies them which they have apparently been unwilling to do.

119.    By reason of the forgoing, it is clear from the record and the decisions that executive employees of PwC directly or indirectly spoon-fed information to Defendants Moore and Kovell, the information from which the

determinations were written.

120.   There are many summary or conclusory statements in the determinations that are unsupported with source documents and there is rank hearsay in the documents. One example is the memorandum dated March 27, 2018 written by Cheryl Riporti of Human Resources in which she summarized information for the determinations but does not provide any source material.

121.   The same is true for Maria Calabrese of Human Resources. She sent a draft, unsigned letter to Plaintiff through Defendant Stahlmann which opens with a gross falsehood about what was said at the January 26, 2017 meeting between Plaintiff and Jeffrey Lavine, a meeting at which she was not present.

122.   Plaintiff was never given the Policy or the Summary Plan Description ("SPD") required by ERISA until well after she was terminated and was at a distinct disadvantage during the time the events leading to her termination were taking place. Multiple attempts were made thereafter to obtain such documents after April 7, 2017 before PwC released them to Plaintiff's counsel.

123.   The designees for the Administrator did not give any due consideration for the points raised by the participant in her submissions, especially the credibility of the PwC's so-called witness, Jeffrey Lavine, who with Defendant Stahlmann had fraudulently induced Plaintiff to leave her employment and join PwC. by inducing her to leave her job and by subsequent false and misleading

statements described above, as well as the discriminatory manner in which she was treated while employed. Such conduct makes this witness unworthy of being believed.

124. The Initial Determination was in summary and conclusory form with no discussion or analysis of the facts. It accepted the conclusions of PwC's employees without analysis or discussion of their merits or the evidence or source to support it. Defendant Kovell adopted and affirmed it, not always reconciling Moore's errors.

125. The determinations failed to credit any of Galli's reliable evidence and presented little of substance from Jeffrey Lavine about the so-called January 26, 2017 meeting with Galli. Galli's evidence about same was precise but not considered or given any weight by the designees, who just "rubber stamped" the information and the decision by PwC not to pay anything beyond what it had paid Galli.

126. In fact, some of the information that was supplied to the Administrators by the human resources personnel ("HR") in the advisory practice were replete with errors. For example, it was stated that Galli was assigned to the Miami office, when she was, in fact, assigned to the New York office, and maintained an apartment in New York City during all three years that she was employed by PwC, at considerable expense. HR claimed that Galli was living in

Florida even though she knew her job responsibilities were in New York.  This is preposterous, especially given the fact that the same HR department wrote a letter for Galli in November 2017 confirming her income so that she could qualify for a new lease on a new apartment she was moving to in January 2017.  Parenthetically, Galli would not have sought a new lease had she known that PwC was thinking of terminating her at the beginning of the lease period, and she was stuck with the apartment until January 2018 even though she was no longer working in New York after her departure from PwC.  Unlike PwC, Galli lives up to her commitments and did not try to break her lease.

127.   Moore and Kovell not only did not adequately consider Galli's evidence, they just stated her position and did not share any of the evidence they had obtained from PwC with Galli.  Galli later saw some of the documentation when it was ultimately supplied in response to a request by her counsel.  That is how she learned that HR was claiming that she was based in Miami, even though all official systems of the firm clearly show Galli as assigned to New York, with a local address in the system, and New York taxes being deducted.

128.   It is clear from the record and the determinations made by Moore and Kovell that they were "spoon fed" information by PwC executives for purposes of molding their decisions.  There was little, if any, investigation, and certainly the information was not shared by the administrators before and, in many cases, even after the determination.  As a result, it is not clear whether the

administrative record is complete.

129.   In addition, neither Defendant Moore nor Defedant Kovell even considered her claim under Section 5c) of the Plan.

130.   Defendants PwC, Moore and Kovell deprived Galli of a full and fair review of her ERISA claims.

## COUNT TWO

### 29 U.S.C. §1132(A)(1)(B)
### ERISA §502(A)(1)(B)
### (RECOVERY OF DENIED BENEFITS UNDER THE PLAN)

131.   Plaintiff repeats and realleges paragraphs 1 through paragraphs 130, as if fully set forth herein.

132.   By reason of the foregoing, the Initial and Final Determinations were the product of a conflict of interest, lacked substantial evidence, and were not reasonably based to sustain the findings and determinations. In issuing the determination the fiduciaries acted in an arbitrary and capricious manner and abused their discretion as to the claim under Section 5 (b) of the Plan.  As to the claim under Section 5(c), each of the fiduciaries ignored the claims, as did the Administrator from the very beginning

133.   There was an ambiguity in the Policy language and the fiduciaries did not resolve it in a reasonable or lawful manner.  Rather than research the legal interpretation of "notice," or follow the regulations, Kovell relied on his "gut" as to what it meant and made up a definition:

"Here I apply the plain English meaning of notice,
i.e., notification of an employee by the Firm of the
employee's forthcoming separation from the Firm."

That is, he made it up out of whole cloth.

Defendant Kovell confirmed that "verbal notice" is the "Firm's typical practice" but offers no proof, and it hard to imagine that a firm such as PwC would rely solely on a verbal conversation to provide notice to an employee, with no witnesses from human resources or at least another partner present and no documentation to back up this claim. Such is a definition of being arbitrary and capricious and an example of true "abuse of discretion.

134.   The Code of Federal Regulations §2520.104b-1 provides in pertinent part:

> (a)   *General disclosure requirements.* The
> administrator of an employee benefit plan covered
> by Title I of the Act <u>must</u> disclose certain material,
> including reports, statements, <u>notices,</u> and other
> documents, to participants, beneficiaries and other
> specified individuals. Disclosure under Title I of the
> Act generally takes three forms. First, the plan
> administrator must, by direct operation of law,
> furnish certain material to all participants covered
> under the plan and beneficiaries receiving benefits
> under the plan (other than beneficiaries under a
> welfare plan) at stated times or if certain events
> occur. [emphasis supplied.]
>
> ****
>
> (b) *Fulfilling the disclosure obligation.* (1)
> Except as provided in paragraph (e) of this
> section, where certain material, including

reports, statements, notices and other documents, is required under Title I of the Act, or regulations issued thereunder, to be furnished either by direct operation of law or on individual request, the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals. [emphasis supplied.] Material which is required to be furnished to all participants covered under the plan and beneficiaries receiving benefits under the plan (other than beneficiaries under a welfare plan) must be sent by a method or methods of delivery likely to result in full distribution.

Galli is entitled to the benefits denied for both her claims.

### COUNT THREE

**29 U.S.C. §1140**
**ERISA §§510 AND 502(A)(3))**
**(EQUITABLE RELIEF FOR INTERFERENCE WITH BENEFITS**
**UNDER A PLAN)**
**(ALL DEFENDANTS)**

135.    Plaintiff repeats and realleges paragraphs 1 through paragraphs 134, as if fully set forth herein.

136.    PwC, PwC Advisory Services, LLC, and the individual defendants, conspired to deprive Plaintiff of her benefits under the Plan.

137.    The acts of these defendants were intentional, deliberate and malicious to cause harm to Plaintiff, which she suffered. The impetus for the defendants to act in such a way is that where possible, Galli stood up for her rights

36

as a human being and as an employee, and spoke truth to power, for example, and not by limitation: where she was defrauded, and she spoke up; where she asked for matters to be rectified, but Defendant Lavine and PwC refused to do so. Galli was trapped by the overly oppressive methods employed by PwC, especially when she asked to be transferred after she learned she had been defrauded and deceived into leaving her job in 2014 to work in a unit subject to two years of sanctions; where her name was placed, without her knowledge or approval, on a list of DFS sanctioned individuals, stemming from fraud to which she was not a party; where she complained because she was not given credit for the work she performed; where she refused to retire when it was suggested by Defendant Lavine in 2016; when she objected to a false rating made against her in July of 2016; and where she refused to sign an Agreement and Release in favor of PwC at the time of her termination; and where she had the temerity to contest it.

138.    None of these were appreciated by PwC and it is now taking it out on Plaintiff.

139.    Not only did she suffer a loss of benefits under the Severance Plan, but by PwC, Lavine and other defendants knew or should have known that she was about to "vest" in her pension Plan. Had she been able to have the meeting with Lavine in early February, to which he did not show, she would have had the opportunity to negotiate a reasonable date for termination. She needed less than 90 days before fully vesting.  By terminating Galli just a little more than three months before her vesting date, PwC proposes to vest only 40% or Galli's

retirement benefits, which now also appears to have been intentional.

140.   Plaintiff Galli is entitled to the benefits permitted against those who interfered with her ERISA benefits by crafting a false excuse that she had been given a "Notice Period" under the Plan.

## COUNT FOUR

### 29 U.S.C. §1104-09
### ERISA §§404-406 AND 409)
### BREACH OF FIDUCIARY DUTY
### (DEFENDANTS PWC, MOORE AND KOVELL)

141.   Plaintiff repeats and realleges paragraphs 1 through paragraphs 140, as if fully set forth herein.

142.   As fiduciaries, Defendants PwC, Moore and Kovell were obligated to administer the Plan as designed and in the best interests of the participants.

143.   By reason of the foregoing, they did not live up to their responsibilities as fiduciaries.

144.   The Plan is entitled to all the remedies provided by the ERISA statute and its progeny.

## COUNT FIVE

## 29 U.S.C. § 1132(A)(3)
## ERISA §502(A)(3))
## (EQUITABLE RELIEF FOR DISCLOSURE VIOLATIONS)
## (DEFENDANT PWC)

145.   Plaintiff repeats and realleges paragraphs 1 through paragraphs 144, as if fully set forth herein.

146.   By reason of the foregoing default by PwC not providing the disclosures required by the ERISA statute and its regulations, including not supplying Ms. Galli with a copy of the policy, not providing certain documents and information she requested, and by making an adverse determination without complying with the disclosure rules.

147.   As a result, Galli has suffered because she was unaware of her benefits under the Plan and it has caused significant effort and expense on her part to obtain this information.

148.   Plaintiff is entitled to all the remedies permitted by the ERISA statute and its progeny.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff hereby demands:

(A)   A fair review of her claims by the Court on a *de novo* basis and a finding that the decisions were in error and/or arbitrary and capricious and should be reversed;

(B)   judgment against Defendants under Count II, III, and V in an amount to which she is entitled under the Plan and has been denied;

(C)    A Default and Summary Judgment in favor of Galli for the full measure of benefits measured by Sections C & D of the Plan;

(D)    A benefit to the Plan for the breach of fiduciary duties by Defendants PwC, Moore, and Kovell, and a remedy such as disgorgement and/or an accounting;

(E)    9% annual interest on the balance owed to Plaintiff Galli from April 30, 2017, as provided by New York law (N.Y. Civil Practice Law and Rules), subject to withholding as required by law;

(F)    post-Judgment interest;

(G)    attorneys' fees, costs and disbursements, as permitted by law or in the discretion of the court; and

(H)    such other or different relief as to this Court seems just and proper.

DATED:   New York, New York
          October 17, 2019

ZEICHNER ELLMAN & KRAUSE LLP

By:    _____
William T. Marshall, Jr.
Attorneys for Plaintiff Susan J. Galli
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
(973) 852-2660
wmarshall@zeklaw.com