William T. Marshall Jr. Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUSAN J. GALLI,

                    Plaintiff,

          - against -

PRICEWATERHOUSECOOPERS LLP
NOTICE/SEVERANCE POLICY As Amended
and Restated Effective February 1, 2011;
PRICEWATERHOUSECOOPERS LLP;
PRICEWATERHOUSECOOPERS ADVISORY
SERVICES, LLC; JEFFREY LAVINE;
CATHERINE STAHLMANN; MARIA
CALABRESE; CHERYL RIPORTI; THOMAS
KOVELL; COURTNEY MOORE,

                    Defendants.

Docket No. 19-cv-07224-(LGS) (SN)

**PLAINTIFF SUSAN J. GALLI'S RESPONSES TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS SUBMITTED
PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Rule 56.1 of the Local Civil Rules of the U.S. District Courts for the

Southern and Eastern Districts of New York, the plaintiff Susan J. Galli ("Plaintiff" or "Galli"),

respectfully submits this response to statement of material facts of defendants

PricewaterhouseCoopers LLP Notice/Severance Policy (the "Plan"), PricewaterhouseCoopers

LLP, PricewaterhouseCoopers Advisory Services LLC, Thomas Kovell, Courtney Moore,

Catherine Stahlmann, Jeffrey Lavine, Cheryl Riporti and Maria Calabrese (collectively, "Defendants").

## A. The Parties

1.      PricewaterhouseCoopers LLP ("PwC" or the "Firm") is a public accounting, tax and management consulting firm.  ("Amended Complaint ¶¶ 5-6, hereinafter "Amended Compl.").

**RESPONSE:** Admit.

2.      PricewaterhouseCoopers Advisory Services LLC ("PwC Advisory Services") is an affiliate of PwC.  (Amended Compl. ¶ 12).

**RESPONSE:** Admit, but adds that it was formed in Delaware in 2014 and activated as a business in New York in the Spring of 2015.  (See Galli OMTC Decl. ¶¶ 16, 32-34).

3.      The Plan is an ERISA welfare benefit plan administered and funded by PwC. (Amended Compl. ¶ 7).

**RESPONSE:** Plaintiff is without knowledge or information to admit or deny this statement. PwC never provided Galli with a copy of the Plan or its Summary Plan Description ("SPD"), as required by ERISA law and regulations, prior to or the whole time she was while employed and even after her termination.  (See Susan J. Galli Declaration on Summary Judgment Motions ("Galli SJ Decl.") ¶ 4).  There is nothing in the administrative record reflecting that it was supplied to prior to or during her employment with PwC.  (See PWC000001-000214).  Despite Plaintiff's requests for the Plan and SPD she never received copies of same until on or about April 26, 2017, after she had engaged counsel to do so on her behalf.  (See Galli SJ Decl. ¶ 4).

She never knew that the "Severance Policy" referred to in her Employment Agreement ("EA") was purported to be an ERISA Plan until that time. Even after that time Defendants were elusive in referring to it or providing her information about it.  (See Galli SJ Decl.

¶¶ 4, 13-14, 17).  This included PwC's and Counsel for the Administrator of the Plan and its supposed designees, including their counsel, Winston & Strawn. Defendants stonewalled and failed to provide Plaintiff with sufficient information about the Plan.  (See Galli SJ Decl. ¶¶ 4, 13-14, 17).  Some of the information provided by Winston & Strawn on behalf of those defendants was incorrect on its face or grossly inadequate. Also, not only did the Defendants not provide information about the Plan, it was never referred to in the EA (except vaguely as a "Severance Plan"), the Arbitration Agreement ("AA"), or in any of the conversations or correspondence among Defendants and Galli until sometime after her termination.  (See PWC000163-000174).

4.      Catherine Stahlmann ("Stahlmann") is a principal of PwC and Jeffrey Lavine ("Lavine") is a partner of PwC; Thomas Kovell ("Kovell"), Courtney Moore ("Moore"), Cheryl Riporti ("Riporti") and Maria Calabrese ("Calabrese") are employees of the Firm. (Amended Compl. ¶¶ 8–9; 13–16).

**RESPONSE:** Plaintiff admits that the referenced individuals are employees of PwC and/or its affiliated company PwC Advisory Services. Moore and Kovell served in dual roles as employees and administrators (fiduciaries) under the Plan. Although a request was made for evidence of the appointment of Moore and Kovell as administrators, there was no specific evidence of each of their appointments in the administrative record.  (See PWC 000098-000111).

5.      Plaintiff Susan J. Galli ("Plaintiff") is a former professional employee of PwC. (Amended Compl. ¶ 1).

**RESPONSE:** Plaintiff admits that she is of former Managing Director of PwC.

6.      Plaintiff commenced her employment with the Firm in August 2014 as a Managing Director in its Advisory line of service.  (Amended Compl. ¶ 1).

**RESPONSE:** Plaintiff admits she commenced her employment with PwC on August 4, 2014. She was recruited in the Spring of 2014. Plaintiff induced to enter the EA with an AA on June 11, 2014.

      7.     Plaintiff was resident in the Firm's New York office. (Amended Compl. ¶ 37).

**RESPONSE:** Admit. Plaintiff was a citizen of Florida but was required to work out of the New York office during her employment. This contradicts a statement made by Riporti to Moore in an email sent to her on March 27, 2018, along with other false and erroneous statements made by her in the same email which reflects on her credibility. (See Galli SJ Decl. ¶ 14; PWC000211).

**B. The Operative Agreements**

      8.     In June 2014, prior to the commencement of Plaintiff's employment with the Firm, PwC sent Plaintiff a letter setting forth the terms of PwC's offer of employment (the "Offer Letter"), and attaching a proposed employment agreement (the "Employment Agreement"), which incorporated an attached arbitration agreement (the "Arbitration Agreement"). (PWC000160-000174).

**RESPONSE:** Plaintiff admits that she received the Offer Letter from PwC by wire.

      9.     The Offer Letter provided that Plaintiff must agree to the terms of the Arbitration Agreement as a mandatory condition of her employment with PwC (PWC000161-000162):

> The terms of your employment are set forth in the Employment Agreement sent electronically (mail or wire) with this letter. The Employment Agreement incorporates an Arbitration Agreement, under which **you and the Firm mutually waive the right to a trial before a judge or jury in court in favor of arbitration for all Covered Claims (as defined in the Arbitration Agreement).** The Arbitration Agreement also requires that Covered Claims be arbitrated on an individual basis, and prohibits claims on a class [or] collective . . . basis.

**RESPONSE:** Plaintiff admits that the Offer Letter contained the above quoted language, as well as other language, but avers that the EA, and the AA attached to it, and the Severance Plan (which was not attached) were part of an overall fraudulent scheme, are unenforceable, unconscionable, and are contrary to New York public policy and therefore null and void. (See Galli SJ Decl. ¶ 3 Declaration of Susan J. Galli, with exhibits, in opposition to Motion to Compel ("Galli OMTC Decl.") ¶ 3)).

        10.     On June 11, 2014, Plaintiff executed the Employment Agreement ("EA") and the attached Arbitration Agreement ("AA").

**RESPONSE:** Plaintiff admits that she electronically signed the EA, for which the AA was attached. (See Galli OMTC Decl. ¶¶ 12, 17). It is a question of law as to what that meant, given the fraud and fraudulent inducement. Plaintiff admits that she was fraudulently induced into entering the EA and AA by the fraudulent and corrupt business practices of PwC, and she would never have joined the Firm or agreed to submit to arbitration and waive her rights to a jury trial, among other things, had she been informed of the pending settlement between the Firm and DFS and the fact that she would be made a party to it. Id.

        11.     By so doing, Plaintiff expressly agreed to mutually binding arbitration with the Firm (PWC000170, ¶ 1(a)):

> This Agreement requires both you and the Firm to resolve all Covered Claims (as described below) exclusively through final and binding arbitration. This Agreement becomes effective on the first day of your employment with the Firm ("Effective Date") and survives and continues to apply following termination of employment. This Agreement is a mandatory condition of your employment with the Firm. Our employment offer is contingent upon, among other things, you electronically signing the Employment Agreement, which incorporates this Agreement. **By electronically signing the Employment Agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**

**RESPONSE:** Plaintiff admits the EA contains such language, however, denies that it is enforceable. This is a legal question given Plaintiff's sworn allegations. (See Galli SJ Decl. ¶ 3; Galli OMTC Decl. ¶¶ 3, 7-20). In other words, the AA was part of the EA which is the product of a corrupt and on-going pattern of racketeering activity by PwC.

12.    Under the terms of the Arbitration Agreement, both the Firm and Plaintiff are required to submit to arbitration all disputes relating to or arising out of Plaintiff's employment with the Firm, or the termination thereof (PWC000170, ¶ 1(c)):

> [T]his Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment, that the Firm may have against you, or that you may have against the Firm (and/or against any of the Firm's partners, principals, employees, or agents), including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered Claims"). Covered Claims include, without limitation, claims under . . . the Employee Retirement Income Security Act [and] claims for breach of fiduciary duty.

**RESPONSE:** Plaintiff admit that the AA contains such language, however, denies that she would be bound by the Agreement as she was fraudulently induced into entering into it. Notably, the referenced section contradicts another provision in the AA excluding ERISA claims. (See PWC000080-PWC000083). The AA states that the following claims are excluded: "(d) Claims subject to arbitration: The following types of claims are excluded from the definition of Covered Claims: (iv) claims for benefits under ERISA which must be resolved in accordance with the terms and procedures set forth in applicable plan documents; and (vi) Disputes arising under the National Labor Relations Act." (Id.)

13.     Under the terms of the Arbitration Agreement, Plaintiff and PwC also agreed that any arbitration of such disputes would be held under the auspices of JAMS, in accordance with JAMS Employment Arbitration Rules and Procedures and subject to the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness.  (PWC000171, ¶ 3(a)).

**RESPONSE:** Plaintiff admits the AA contains such language, however, she denies that the AA is enforceable or that she would be bound by the AA as she was fraudulently induced into entering into it.

14.     Under the terms of the Arbitration Agreement, PwC is obligated to pay all costs unique to arbitration, including the costs of JAMS and the Arbitrator, and the arbitration must take place in the county in which Plaintiff's PwC work office is or was located (here, New York County) (PWC000172, ¶ 3(c), (d)).

**RESPONSE:** See the responses to Nos. 11-13 above. Plaintiff admits that the AA states the above but denies that she would be bound by the ambiguous terms of the AA because she was fraudulently induced into entering into it.

15.     The Arbitration Agreement provides that it is governed by the FAA and, to the extent, if any, that the FAA is held not to apply, by the law of the State of New York, without regard to its conflict of laws principles.  (PWC000173, ¶ 5).

**RESPONSE:** Plaintiff admits that the AA contains such language, however, denies that she would be bound by the AA as she was fraudulently induced into entering into it.

16.     PwC is designated as the plan administrator under the Plan. (PWC000176, § 2(a)).

**RESPONSE:** Plaintiff admits that the referenced Plan contains such language, however, Defendants have failed to establish that the "Plan" is a qualified plan under ERISA. There is nothing in the administrative record establishing or confirming that it is a qualified plan either.  The

information supplied by Defendants' counsel conflicts with public filings and raises questions of fact that the Plan was properly filed.  (See PWC000112, PWC000127, PWC000133).

  17. As plan administrator, the Plan provided PwC and its designees "full, complete and exclusive discretionary authority to interpret the Policy and to make any determinations related to the administration of the Policy to the maximum extent permitted by law . . ." (PWC000180, § 7(b)).

**RESPONSE:** Plaintiff admits that the Plan so states, however, denies that Defendants properly exercised their authority.  (See Galli SJ Decl. ¶ 4).

  18. This discretion explicitly included authority to "to supply omissions from, correct deficiencies in, or resolve inconsistencies or ambiguities in the language of the [Plan] . . ." (PWC000180, § 7(b)(i)).

**RESPONSE:** See Plaintiff's response to ¶ 17.

  19. This discretion also explicitly included authority to "determine all questions of fact arising under the Policy, including questions as to eligibility for, and the amount of notice and/or severance pay in lieu of notice . . ." (PWC000180, § 7(b)(ii)).

**RESPONSE:** See Plaintiff's response to ¶ 17. However, the question of what constitutes "notice" is a question of law and equity.

  20. The Plan also provided PwC with authority to "delegate responsibilities to others to assist in administering the Policy . . ." (PWC000180, § 7(b)(iv)).

**RESPONSE:** Plaintiff admits that the Plan contains such language, however, proof of such delegation in this matter is inadequate.  There is nothing in the administrative record to reflect that Kovell had the authority to make any delegation to assist in administering the Plan/Policy.  (See PWC000001-PWC000214

On March 29, 2018, apparently as a result of Plaintiff's claim, Kovell drafted a memo designating the Line of Service Human Capital Operations Leader to determine all claims. (See PWC000197). This essentially means that all claims submitted by employees will be decided by a line of Service Human Capital Operations Leader, who reports to the same business people that are involved in the claim. This practice is hardly likely to render a favorable outcome for any employee given the inherent conflict of interest and the lack of fiduciary expertise. In the case of the individual designated in this case, Moore, she was connected to all of the other defendants on Linked In and works closely with them in her daily responsibilities.  This is hardly an impartial and unbiased administrator. She relied on erroneous facts.

21.    The Plan provided that any employee "who incurs a Covered Termination shall receive such prior Notice Period, if any, as is specified in his or her Employment Agreement." (PWC000179, § 5(a)(i)).

**RESPONSE:** Plaintiff admits that the Plan contains such language, however, denies that she was given the requisite notice. The Plan defers to the language of the EA, and does not reject any provision and, therefore, adopts the provisions related to paragraphs 4, 5 and 19 of the EA.  (See PWC000164-000170).

On March 7, 2014, after receiving a draft separation letter dated February 27, 2017 that was emailed to Galli by Stahlmann, Galli attempted to obtain a copy of her EA which she had misplaced in a recent move, and was told repeatedly by Calabrese that the Severance Plan was incorporated in the EA. (See Galli SJ Decl. ¶¶ 4, 9-10).  After asking several times, Calabrese sent Galli a copy of her EA on April 12, 2017, and in that email stated "... I have attached your EA, which has the policy within the document..." The EA, however, does not have the Plan within the document.  (See Galli SJ Decl. ¶ 4).  The above paragraph does not define notice, and it appears to

be synonymous with severance. After receiving the referenced draft separation letter this was Galli's first inkling that she was actually going to be separated and on a particular date, April 7, 2017. That date had never been mentioned to her before.

22.     Where an employee does not have specified notice period in the employee's employment agreement, the Plan provides the administrator with discretion to provide such prior notice period as the administrator "deems appropriate under the circumstances." (PWC000179, § 5(a)(ii)).

**RESPONSE:** Plaintiff denies this section is applicable or even relevant. It is undisputed that the EA provided for three months notice. (See ¶ 19 of EA). Plaintiff denies receiving the requisite notice. (See PWC000164; Galli OMTC Decl. ¶ 3, et seq.; Galli SJ Decl. ¶ 3). The Severance Plan does not negate ¶ 19 of the EA.

23.     Subject to certain exclusions not applicable here, the Plan defines Covered Termination as any termination in which "an Eligible Employee whose employment is terminated by the Firm for reasons other than professional, legal, ethical, or Firm policy violations . . ." (PWC000178, § 4(a)).

**RESPONSE:** Admit. It is undisputed that Galli's termination was a covered termination. (See ECF #20).

24.     The Employment Agreement provided that if Plaintiff's employment was "terminated by the Firm for reasons other than professional, legal, ethical or Firm policy violations, subject to [the Plan], [Plaintiff would] be provided with: . . . three months' notice, if [Plaintiff had] been employed for two years but less than five years . . ." (PWC000164, § 5(a)).

**RESPONSE:** Admit.

25.     The Employment Agreement further provided that "[t]he Firm reserves the right under the Severance Plan to pay [Plaintiff's] base salary in lieu of continued employment for any or all of the applicable notice period."  (PWC000164, § 5(a)).

**RESPONSE:** Plaintiff admits that the EA so states, however, Lavine never discussed this fact with Plaintiff.  (See SJ Galli Decl. ¶¶ 5-10).

26.     Section 11 of the Plan ("Amendment or Termination") provides that amendments to the Plan may only be made by specified individuals.  (PWC000183).

**RESPONSE:**  Admit.

27.     Section 7(c)(i) of the Plan ("Claims for Payments") specifies that claims for payments must be made to the administrator in writing.  (PWC000181).

**RESPONSE:** Plaintiff admits that the Plan contains such language, however, PwC made adverse determinations without complying with the provisions of the ERISA statute.

**C.  Plaintiff's Separation from the Firm, Demand Letter and Initial Claim**

28.     On January 26, 2017, Plaintiff attended a meeting with Lavine.  (PWC000006).

**RESPONSE:** Plaintiff admits that on that date, Lavine called her at her office and requested that she come to his office. He did not tell her the purpose of the meeting. No one else was present at the meeting.  (See Galli SJ Decl. ¶¶ 5-6).

29.     At that meeting, Lavine notified Plaintiff that she was being separated from the Firm. (PWC000152; PWC000157).

**RESPONSE:** Deny.  (See Galli SJ Decl. ¶¶ 5-10).

30.     Plaintiff requested that her separation from the Firm be extended to April 7, 2017, in order to permit her to attend an industry conference as a PwC employee.  (PWC000151).

**RESPONSE:**          Deny.  This is a blatant falsehood.  (See Galli SJ Decl. 5-10).  Moreover, the administrative record is devoid of credible evidence of such request.

      31.     Plaintiff was separated from the Firm effective April 7, 2017.  (PWC000001).

**RESPONSE:** Admit.

      32.     Plaintiff received approximately ten weeks' advance notice of her separation from the Firm.  (PWC000153).

**RESPONSE:** Deny.  (See Galli SJ Decl. ¶¶ 5-15).

      33.     Pursuant to the terms of her Employment Agreement, Plaintiff was entitled to an additional two weeks' severance in lieu of notice.  (PWC000152–53).

**RESPONSE:** Deny.  The citation to the administrative record does not support this statement and the referenced section is hearsay.

      34.     Plaintiff's base salary at the time of her separation was $420,000.  (PWC000072, 000152).

**RESPONSE:** Admit.

      35.     Plaintiff received an unconditional payment of $31,907 under the Plan following her separation.  (PWC000004).

**RESPONSE:** Admit that she received a partial payment, but she did not receive the signed letter until April 10th or 11th., 2017.  (See PWC000013).

      36.     The unconditional payment represented 3.6 weeks of severance.  (PWC000153).

**RESPONSE:** Plaintiff admits she received a payment, however, she contends that she was entitled to more money than what was supplied.  (See Galli SJ Decl. ¶ 3, Galli OMTC Decl. ¶ 3, administrative record).

37.     In May 2017, Plaintiff's counsel sent PwC a demand letter dated May 24, 2017 (the "May 2017 Demand Letter") alleging claims for age discrimination, gender discrimination, fraud and violations of a covenant of good faith and fair dealing, as well as for additional benefits under the Plan.  (PWC000084–000097).

**RESPONSE:** Plaintiff admits that the letter contained such claims for benefits under the Plan, among other things.

38.     In the May 2017 Demand Letter, Plaintiff claimed that the Firm "never gave her notice of her termination verbally or in writing."  (PWC000091).

**RESPONSE:** Plaintiff admits that proper notice of terminations was not supplied in accordance with the EA.

39.     In the May 2017 Demand Letter, Plaintiff acknowledged that she met with Lavine on January 26, 2017.  (PWC000091).

**RESPONSE:** Admit.

40.     In the May 2017 Demand Letter, Plaintiff acknowledged that Lavine told her on January 26, 2017, that she was "on a list of employees to be let go."  (PWC000091).

**RESPONSE:** Plaintiff denies the accuracy of the referenced quote. The letter states that she was only "on a list of **proposed** employees to be let go."  (See PWC000091).

41.     Following receipt of May 2017 Demand Letter, PwC shared with Plaintiff's counsel an email sent by Plaintiff on March 9, 2017, in which Plaintiff stated, "I will not be at PwC [in May]."  (PWC000204-000205).

**RESPONSE:** Deny. This a misleading statement. Defendants' counsel did not share said correspondence with Plaintiff's counsel until a year and three months after the May 2017 letter issued.  (See PWC000136; Galli SJ Decl. ¶ 16).

42.     By letter to PwC's counsel dated September 27, 2017 (the "September 2017 Demand Letter"), Plaintiff reiterated her purported claims against the Firm.  (PWC000020-000040).

**RESPONSE:** Admit.

43.     Plaintiff also claimed in the September 2017 Demand Letter that she was not aware that she would be required to work during any notice period provided under the Plan. (PWC000038).

**RESPONSE:** Admit.

**D.  Plaintiff's Claim for Additional Severance Benefits**

44.     Plaintiff submitted her claim for benefits under the Plan by letter dated January 18, 2018 (the "Claim Letter").  (PWC000001–000051).

**RESPONSE:** Admit.

45.     In the Claim Letter, Plaintiff alleged that she had not received "the minimal vested benefits to which she believes she is entitled under the Plan, i.e., three months' severance pay, as the result of her termination."  (PWC000002).

**RESPONSE:** Admit.

46.     In the Claim Letter, Plaintiff sought an additional severance payment of $73,096, allegedly representing three months of her base salary ($105,000) less the payment of $31,907. (PWC000004).

**RESPONSE:** Admit.

47.     In the Claim Letter, Plaintiff additionally sought a $1 million payment under Section 5(c) of the Plan for a release of her purported claims for discrimination and fraud. (PWC000010-000012).

**RESPONSE:** Admit.

48.    In the Claim Letter, Plaintiff disputed whether she was provided sufficient notice of her separation from the Firm prior to her April 7, 2017 separation date, and claimed that PwC had taken her comments in the March 9, 2017 email message "out of context."  (PWC000006-000008).

**RESPONSE:** Admit.

49.    In the Claim Letter, Plaintiff again conceded that she met with Lavine on January 26, 2017, and that during the meeting they discussed her separation from the Firm.

**RESPONSE:** Deny, separation was not mentioned, it was a broad term.  (PWC6-7).

50.    In the Claim Letter, Plaintiff characterized her conversation with Lavine in January 2017 as lacking sufficient "specifics" to constitute notice under the Plan.  (PWC000006).

**RESPONSE:** Admit.

51.    In the Claim Letter, Plaintiff acknowledged that following her conversation with Lavine in January, "the reality of her possible termination was setting in . . ." (PWC000009).

**RESPONSE:** Admit.

**E.  The Review of the Claim Letter and Initial Determination**

52.    Following receipt of the Claim Letter, PwC Advisory Human Capital Operations Leader Courtney Moore, on behalf of PwC, reviewed and investigated Plaintiff's claim for additional benefits.  (PWC000152–53).

**RESPONSE:** Denied.  Moore did not include documents with her decision and failed to supply the documents requested following her decision.  (See PWC000098- PWC000111).

53.    PwC delegated authority to Moore to "hear, decide and adjudicate, in accordance with ERISA, initial claims brought pursuant to Section 7(c) of the [Plan] . . ." (PWC000135).

**RESPONSE:** Deny. There is no evidence in the record of the delegation of authority to her, and Defendants did not supply such evidence despite Plaintiff's requests for same. (See PWC000001-PWC000214).

54.     Moore's investigation included an "interview" with PwC partner Jeffrey Lavine regarding his conversation with Plaintiff on January 26, 2017. (PWC000152).

**RESPONSE:** Deny. There is no copy of the "interview" in the administrative record section cited by Defendants.

55.     During that interview, Lavine confirmed that he informed Plaintiff on January 26, 2017, that she was being separated from the Firm. (PWC000052; PWC000152-000153).

**RESPONSE:** Denied. There is no proof of it. The citations do not support the hearsay statement and there is no declaration from Lavine in support of Defendants' motion regarding such. Likewise, there was no mention of the Plan or the date that Plaintiff was told when her termination date would be.

56.     Moore also gathered information from PwC Human Capital Team Leader Cheryl Riporti regarding Plaintiff's notification. An email from Riporti to Moore dated March 27, 2018, summarizing this information was provided to Plaintiff during the course of the claims procedure. (PWC000151).

**RESPONSE:** Deny the accuracy of the summary of the information. (See Galli SJ Decl. ¶¶ 14-15; Galli OMTC Decl. ¶ 3, et seq.). The Record shows that Riporti provided her with conclusory information before Moor even assumed the duties of a fiduciary.

57.     In an email message to Moore dated March 27, 2018, Riporti corroborated that Lavine unequivocally notified Plaintiff of her separation from the Firm by January 26, 2017. (PWC000151).

**RESPONSE:** Denied. There was no basis for her corroboration, and notably, defendants Riporti and Lavine have failed to supply declarations on this issue. The statement is double hearsay.

58.    Moore also reviewed contemporaneous email messages from Plaintiff in early 2017 demonstrating that she was aware of her separation from the Firm, including a January 31, 2017 message from Plaintiff in which Plaintiff stated, in pertinent part that, "FYI, I know it's moot for me since I'll be departing soon . . ." (PWC000153).

**RESPONSE:** Denied. That email was taken out of context. (See Galli SJ Decl. ¶ 16).

59.    Moore also reviewed the following contemporaneous email messages from Plaintiff demonstrating Plaintiff's awareness of her impending separation (PWC000136–50):

- Stahlmann's March 7, 2017 email to Plaintiff attaching a separation letter that specified April 7, 2017 as Plaintiffs. separation date.

- Plaintiff's March 9, 2017 email to Lavine and a PwC principal regarding a potential speaking opportunity in May, noting that she had advised the event organizers that "I will not be at PwC at that time."

- Plaintiff's March 9, 2017 email to Calabrese regarding the separation letter she had received. from Stahlmann, noting that her last day with the Firm specified in that latter (April 7, 2017) fell on the week of a certain industry conference in Florida.

- Plaintiff's March 16, 2017 email to Lavine inquiring whether the post-employment restrictions contained in her Employment Agreement would be applicable to her in "[her] next role."

- Plaintiff's March 24, 2017 email to PwC Executive Assistant Betty Sims regarding meeting for coffee, noting that "I am leaving the Firm too as of April 7."

**RESPONSE:** Plaintiff lacks knowledge of Moore's actual review, and contends the administrative record is incomplete. (See Galli SJ Decl. ¶¶ 4-26).

60.    Following her review of Plaintiff's emails and interviews with Lavine, Riporti and PwC Human Capital Manager Maria Calabrese, Moore concluded that Plaintiff "knew of her impending departure on or before January 31, 2017." (PWC000153).

17

**RESPONSE:** Denied.  Plaintiff lacks knowledge of Moore's actual review, and contends the administrative record is incomplete.  (See Galli SJ Decl. ¶¶ 4-26).

61.    The notes of Moore's review were provided to Plaintiff during the course of the claims process.  (PWC000152-000053).

**RESPONSE:** Plaintiff denies that the "notes" were timely provided to Plaintiff's counsel. Plaintiff should have received the requested items on July 8, 2018, however did not receive them until on or about July 19, 2018.

62.    By letter dated April 11, 2018, PwC issued its determination on Plaintiff's claim for additional benefits (the "Initial Determination").  (PWC000052-000055).

**RESPONSE:** Plaintiff admits that a determination issued on April 11, 2018, upon review, it was not an initial determination.

63.    The Initial Determination stated, in pertinent part, that the "Employment Agreement provided that in the event of termination of her employment by the Firm under certain circumstances [Plaintiff] would be provided with advance notice of such termination (the 'Notice Period') or severance in lieu of all or a part of the Notice Period. The duration of the Notice Period would depend upon the length of her employment with the Firm."  (PWC000052).

**RESPONSE:** Plaintiff admits that Defendants properly quote the EA.

64.    The Initial Determination found that Plaintiff spoke in person with PwC partner Lavine regarding the termination of her employment on January 26, 2017.  (PWC000052).

**RESPONSE:** Plaintiff admits that Plaintiff spoke with Lavine on that date, however, denies that he discussed the termination of her employment on that date.  (See Galli SJ Decl. ¶¶ 4-19).

65.    The Initial Determination concluded that Plaintiff "was provided with notice of termination of her employment on January 26, 2017."  (PWC000054).

**RESPONSE**: Plaintiff admits that such language is in the determination, however, denies the accuracy.

66.     The Initial Determination concluded that, under the Employment Agreement, Plaintiff was entitled to a combined three months of notice of termination of her employment and severance in lieu of notice.  (PWC000054).

**RESPONSE**: Plaintiff admits that such conclusion is in the determination, however, denies the accuracy.

67.     The Initial Determination found that Plaintiff's employment with the Firm had terminated effective April 7, 2017.  (PWC000052).

**RESPONSE:** Admit.

68.     The Initial Determination found that, "[f]ollowing the termination of her employment, [Plaintiff] was provided with an unconditional payment of $31,907.00, less applicable statutory deductions and authorized withholdings, representing severance in lieu of the remaining balance of [Plaintiff's] Notice Period under the Employment Agreement." (PWC000053).

**RESPONSE:** Plaintiff admits the determination states as such.

69.     The Initial Determination found that, "[p]er the terms of the Employment Agreement, the applicable Notice Period was three months. [Plaintiff) was provided with notice of termination of her employment on January 26, 2017. Following the termination of her employment on April 7, 2017, [Plaintiff] was provided with an unconditional payment of $31,907.00, less applicable statutory deductions and authorized withholdings, representing severance in lieu of the remaining balance of the Notice Period. Thus, [Plaintiff] was given a

Notice Period (comprised of notice and severance in lieu notice) of more than three months."
(PWC000054).

**RESPONSE:** Plaintiff admits the determination states as such.

70.     The Initial Determination concluded that, "[ ]n summary, [Plaintiff] was provided with the Notice Period in accordance with Section 5 of the Policy. No further severance benefits are due to [Plaintiff] under the terms of the Policy." (PWC000054).

**RESPONSE:** Plaintiff admits that the determination states as such, however, denies the accuracy of the conclusion.

**F.  Plaintiff's Appeal from the initial Determination**

71.     By letter dated June 6, 2018, Plaintiff submitted an appeal under the Plan of the Firm's Initial Determination (the "Appeal Letter"). (PWC000056-97).

**RESPONSE:** Admit. In addition, Plaintiff submitted a request for documents and information. PWC000098-PWC000111).

72.     At the outset of the Appeal Letter, Plaintiff noted that "this is a dispute involving the narrow issue whether Plaintiff was given proper 'Notice' of termination pursuant to § 19 of her Employment Agreement, when it was given, and the method by which her benefits should have been calculated." (PWC000058).

**RESPONSE:** Admit.

73.     In the Appeal Letter, Plaintiff argued that "there was no proof that 'notice of termination' was ever given at all to [Plaintiff] during the January 26, 2017 meeting between Mr. Lavine and [Plaintiff]." (PWC000068).

**RESPONSE:** Admit.

74.     In the Appeal Letter, Plaintiff further argued that "any notice of termination needed to be in writing and signed by the U.S. Human Resource Leader."  (PWC000068).

**RESPONSE:** Admit.

**G.  The Review of the Appeal Letter and Determination on Review**

75.     Following PwC's receipt of the Appeal Letter, PwC Human Capital Operations Leader Tom Kovell, acting on behalf of PwC, reviewed Plaintiffs Claim Letter, the Initial Determination and the Appeal Letter, as well as the parties' correspondence and other attachments to that correspondence.  (PWC000157).

**RESPONSE:** Denied. Defendants never supplied the requested documentation evidencing his authority to do so.  (See Administrative Record).

76.     All information and documentation relied upon, submitted, considered or generated in the course of making the benefit determination, as well as any materials demonstrating compliance with the requisite administrative process and safeguards were provided to Plaintiff during the course of the claims process.  (PWC000112-53).

**RESPONSE:**  Denied. The record is incomplete, there are partial e-mails without the complete, no interview documents/records.  (See Galli SJ Decl. ¶¶ 3-25).

77.     The Administrative Record includes the multiple email messages sent by Plaintiff after her January 26,2017 meeting with. Lavine in which Plaintiff states that she will be leaving the Firm. (PWC000198-210).

**RESPONSE:**  Denied. The Record is incomplete.  (See Galli SJ Decl. ¶¶ 3-25).

78.     Kovell interviewed several individuals, including Lavine, regarding the meeting with Plaintiff on January 26, 2017, and Lavine confirmed to Kovell that "during that meeting, [Lavine] unequivocally informed [Plaintiff] that her employment was being terminated." (PWC000157).

**RESPONSE:** Denied. There are no records or documented interviews to support such statement, and there is no Declaration from Lavine supplied in support of Defendants' motion.

79.     By letter dated August 1, 2018, PwC issued a determination on review of Plaintiff's Appeal Letter (the "Final Determination"). (PWC000154-214).

**RESPONSE:** Admit.

80.     The Final Determination acknowledged, in pertinent part, that both the Firm and Plaintiff agreed that Plaintiff was entitled to "three months' combined notice of termination and/or severance." (PWC000157).

**RESPONSE:** Plaintiff admits that the Final Determination contains such language.

81.     In the Final Determination, Kovell acknowledged Plaintiff's assertion in the Appeal Letter that any notice of termination under the Plan must be provided in writing. (PWC000157).

**RESPONSE:** Admit.

82.     Kovell found that "[V]erbal notice of termination is sufficient under the Employment Agreement and the Policy." (PWC000157).

**RESPONSE:** Plaintiff admits that he found as such, but denies the validity of his finding.

83.     In support of that finding, Kovell noted in the Final Determination that "the Employment Agreement Section 5(a) ('Termination by the Firm') governs notice of termination by the Firm. That section explicitly provides that such notice is 'subject to the Firm's Notice/Severance Policy.' (PWC000157).

**RESPONSE:** Plaintiff admits that he noted as such, but denies the validity of his finding.

84.    Kovell also noted that "neither the Policy nor the Employment Agreement specifies a particular 'method or means of notice.'" (PWC000157).

**RESPONSE:** Plaintiff admits that he noted as such, but denies the validity of his finding.

85.    In interpreting those provisions, Kovell applied "the plain English meaning of notice, i.e. notification of an employee by the Firm of the employee's forthcoming separation from the Firm." (PWC000157).

**RESPONSE:** Denied. There is nothing in the record to support this meaning. Moreover, Kovell's conclusion is in conflict with the documents and information supplied. (See Galli SJ Decl. ¶¶ 4-25).

86.    In addition, Kovell found that verbal notice is the Firm's "typical practice." (PWC000157).

**RESPONSE:** Denied. There is nothing in the record evidencing the Firm's "typical" practice. In addition, the phrase is meaningless and overly broad.

87.    The Final Determination recognized that multiple email messages and other contemporaneous documentation contradicted Plaintiffs contention that "there is no proof that anything of substance was discussed about [her] termination at the January 26th Meeting." (PWC000157-58).

**RESPONSE:** Denied. (See Galli SJ Decl. ¶¶ 4-25).

88.    The Final Determination concluded that "this information and material confirms that [Plaintiff] received notice of the termination of her PwC employment on January 26, 2017, no further severance benefits are due [Plaintiff] under the terms of the Policy, and the Appeal is denied." (PWC000158).

**RESPONSE:** Plaintiff admits the determination states as such, however, denies the accuracy of such conclusion.   This is not true of the claims under Section 5(b).   There is no "notice" requirement under Section 5(c).

Dated: New York, New York
      January 15, 2020

                                    ZEICHNER ELLMAN & KRAUSE LLP

By:     _____

                                William T. Marshall, Jr.
                                Attorneys for Plaintiff
                                Susan J. Galli
                                1211 Avenue of the Americas
                                New York, New York 10036
                                (212) 223-0400