William T. Marshall Jr. Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUSAN J. GALLI,

                Plaintiff,

      -against-

PRICEWATERHOUSECOOPERS LLP
NOTICE/SEVERANCE POLICY As Amended
and Restated Effective February 1, 2011;
PRICEWATERHOUSECOOPERS LLP;
PRICEWATERHOUSECOOPERS ADVISORY
SERVICES, LLC; JEFFREY LAVINE:
CATHERINE STAHLMANN; MARIA
CALABRESE; CHERYL RIPORTI; THOMAS
KOVELL; COURTNEY MOORE,

                Defendants.

Docket No. 19-cv-07224-(LGS) (SN)

## PLAINTIFF SUSAN J. GALLI'S COUNTER-STATEMENT OF MATERIAL FACTS SUBMITTED PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the U.S. District Courts for the

Southern and Eastern Districts of New York, plaintiff Susan J. Galli ("Plaintiff" or "Galli"),

respectfully submits this counter-statement of material facts in support of her cross-motion for

summary judgment pursuant to Federal Rules of Civil Procedure Rule 56.

**Parties**

1.      In Spring 2014, prior to joining PwC, Plaintiff was employed by a global bank and was an experienced and accomplished AML subject matter specialist, having served in the financial services industry for over 27 years. (See ECF #25 ¶2; Susan J. Galli Declaration in Opposition to Motion to Compel Decl. ("Galli OMTC Decl.") ¶¶ 3, 10[1]).

2.      Plaintiff accepted the offer of employment from PwC in June 2014.  (See Galli OMTC Decl. ¶¶ 3, 17).

3.      Beginning on or about August 4, 2014, Galli served as a Managing Director, as one of three leaders, in PwC's Anti-Money Laundering (AML) Advisory unit. (See ECF #25 ¶1; Galli OMTC Decl. ¶¶ 3, 4).

4.      PwC terminated Plaintiff from employment with PwC's AML Advisory unit which, claiming effective April 7, 2017, which is part of a wholly-owned subsidiary of PwC, and to which Plaintiff had been transferred about July of 2015, without any explanation. (See ECF #25 ¶3; Galli OMTC Decl. ¶ 32).

5.      Defendant PwC's Severance Plan represents itself to be an ERISA welfare benefit plan created and administered by PwC and filed with the United States Department of Labor. (See ECF #25 ¶7; PwC000114, PwC000127-000128).

6.      Defendant Courtney Moore ("Moore") is employed by PwC in its Human Capital Operations at PwC in Chicago, Illinois 60606. (See ECF #25 ¶8; PwC000055).

---

[1]   Plaintiff was living in New York, New York in Spring 2014 and throughout her entire time of employment at PwC.

7.    Moore was delegated by PwC to act as a fiduciary in deciding claims asserted by Galli in January 2018 under the Plan, PwC, however, did not produce to Plaintiff the requested documents showing authority for such delegation.   (See ECF #25 ¶8; PwC000052, PwC000100-000104).

8.    Defendant Thomas Kovell ("Kovell") is an employee of PwC, a Human Capital Operations Leader in PwC's office at 2001 Market Street, Philadelphia, Pennsylvania 19103. (See ECF #25 ¶9).

9.    Kovell was delegated to be the fiduciary by PwC in deciding an appeal made by Plaintiff in June 2018 from a previous denial of her benefits in a decision issued by Moore in April 2018. (See ECF #25 ¶11).

10.    PwC Advisory Services, LLC is an enterprise formed in Delaware by PwC and authorized to do business in New York, New York in 2015. (See ECF #25 ¶12; Galli OMTC Decl. ¶ 32, Exh. D).

11.    Defendant Jeffrey Lavine ("Lavine") at relevant times was, and is, a partner of PwC, to whom Plaintiff reported. (See ECF #25 ¶13; Galli OMTC Decl. ¶ 3).

12.    Defendant Catherine Stahlmann ("Stahlmann") at relevant times was a "principal" of PwC. (See ECF #25 ¶14; Galli OMTC Decl. ¶ 3).

13.    Defendant Maria Calabrese ("Calabrese") at relevant times was an employee in PwC's Human Resources Department. (See ECF #25 ¶15; Galli OMTC Decl. ¶ 3).

14.    Defendant Cheryl Riporti ("Riporti") at relevant times was an employee in PwC's Human Resources Department. (See ECF #25 ¶ 16; Galli OMTC Decl. ¶ 3).

**PwC's Fraudulent Deception of The New York Banking Department**

15.     In or around 2008, PwC made a calculated decision to risk its entire business reputation by engaging in a conspiracy with one of its banking clients to deceive and defraud both U.S. Government and New York State banking regulators (including the entity now known as the New York Department of Financial Services ("DFS") which had been investigating one of PwC's bank clients for possible violations of U.S. and New York banking laws and Anti-Money Laundering and Office of Foreign Assets Control ("OFAC") sanctions laws, rules and regulations. (See ECF #25 ¶19[2]; Galli OMTC Decl. ¶ 5).

16.     The investigation involved actions by the bank unlawfully clearing about 28,000 transactions worth about $100 Billion between 2002 and 2007 involving foreign entities suspected of Money-Laundering, sanctions evasion and other crimes. (See ECF #25 ¶20[3]).

17.     The bank hired PwC to analyze the transactions and develop an Historical Transactions Report (HTR) to present to the regulators to assess the severity of the suspected violations by the subject bank. The banking regulators apparently agreed to accept and rely on the findings of PwC in the HTR. (See ECF #25 ¶21[4]; Galli OMTC Decl. ¶¶ 5-7).

18.     PwC personnel were present at a presentation to the regulators by the bank and then, or shortly thereafter, discovered that the investigation was more serious than anticipated, and that a forensic review should have been recommended by PwC. (See ECF #25 ¶22[5]; Galli OMTC Decl. ¶¶ 5-7).

---

[2]   This is a matter of public record for which the court may take judicial notice.
[3]   This is a matter of public record for which the court may take judicial notice.
[4]   This is a matter of public record for which the court may take judicial notice.
[5]   This is a matter of public record for which the court may take judicial notice.

19.     Motivated by profit, PwC acceded to the request of the bank and knowingly disregarded that the regulators had also become "clients" of PwC for purposes of its assessment in the HTR. (See ECF #25 ¶23[6]; Galli OMTC Decl. ¶¶ 5-7).

20.     PwC agreed to make false and deceiving changes to the HTR, as requested by the bank, to affect the outcome of the regulators' decision as to what fines or sanctions might be appropriate for the bank. (See ECF #25 ¶23[7]; Galli OMTC Decl. ¶¶ 5-7).

21.     The bank was eventually fined by DFS in the amount of $250,000,000 for its role in clearing the transactions involving sanctioned entities. (See ECF #25 ¶24).

22.     In 2013 and 2014 DFS conducted a subsequent investigation into PwC's role in the cover up as a result of the falsified HTR. (See ECF #25 ¶25[8]; Galli OMTC Decl. ¶¶ 5-7).

23.     The investigation was settled by an agreement in August 2014.  The bank was fined an additional $350,000,000 and PwC was fined in the amount of $25,000,000, the largest fine ever levied against a financial services advisory firm.[9] In reality it was a minimal portion of PwC's income for 2014, which was approximately $34 billion[10] and made PwC the sixth largest private company in America on the Forbes list. (See ECF #25 ¶26[11]; Galli OMTC Decl. ¶¶ 5-7).

---

[6]   This is a matter of public record for which the court may take judicial notice.
[7]   This is a matter of public record for which the court may take judicial notice.
[8]   This is a matter of public record for which the court may take judicial notice.
[9]   This is a matter of public record for which the court may take judicial notice.
[10]  The Forbes List of America's Largest Private Companies, 2014.
[11]  This is a matter of public record for which the court may take judicial notice.

**PwC's Fraudulent Inducement of Galli**

24.     While the referenced investigation of PwC was going on, PwC's partner Lavine, and principal, Stahlmann, began recruiting Plaintiff in May 2014. (See ECF #25 ¶27; Galli OMTC Decl. ¶¶ 4, 8).

25.     Lavine and Stahlmann told Plaintiff that PwC wanted to hire Galli as an experienced catalyst hire to elevate its profile in the area of financial crimes compliance; that it had been neglecting its marketing and practice development initiatives; that she was being hired because of her high profile in the AML community and her extensive network of contacts; and that PwC wanted her to provide it with greater visibility at key industry conferences and raise the Firm's profile in financial crime compliance.  In other words, she was hired because of her "brand" in the industry. (See ECF #25 ¶27; Galli OMTC Decl. ¶¶ 9-11).

26.     Lavine and Stahlmann never disclosed to Galli the material fact that the DFS investigation was targeting the very unit (Regulatory Advisory Services of "RAS") she was being hired for, and the almost certainty that it was going to be severely sanctioned, and most importantly, the negative consequences this would pose to Plaintiff personally. (See ECF #25 ¶28; Galli OMTC Decl. ¶¶ 9-20).

27.     PwC's offer of employment to Plaintiff was made under false pretenses. The Firm offered her an attractive compensation package to lure her into leaving her secure and very senior global position with a large global bank and foregoing other opportunities, but only provided an "at will" agreement with a three-month termination notice. (See ECF #25 ¶29; Galli OMTC Decl. ¶¶ 9-20).

28.     The Firm put intense pressure on her to join as soon as possible, likely knowing that a settlement with the DFS was imminent, and that Plaintiff would probably choose to go elsewhere, if she knew about the conditions of the settlement. (See ECF #25 ¶30; Galli OMTC Decl. ¶¶ 4, 9-20).

29.     Had Plaintiff known of the regulatory problem, she would not have signed the Employment Agreement ("EA") or the Arbitration Agreement ("AA"), and would have hired a lawyer, or most likely would have stayed where she was or would have pursued one of the other consulting opportunities for which she was being sought. (See ECF #25 ¶31; Galli OMTC Decl. ¶¶ 9-20).

30.     Had Defendants disclosed the regulatory problem to Plaintiff, Plaintiff would not have agreed to the EA or the AA; the overly broad, non-competitive restrictive covenants; the waiver of her right to a jury trial; as well as her right to participate in a class or representative action, among other things. (See ECF #25 ¶32; Galli OMTC Decl. ¶ 12).

31.     Having noticed that PwC had a separate AML technology unit which was part of its Risk Assurance line of service, at that time Plaintiff specifically asked Lavine, the PwC partner in the AML Risk Advisory Services ("RAS") unit that was part of the Advisory line of business, if that factor would pose any internal competition to Plaintiff and the advisory practice in terms of competing for clients. (See ECF #25 ¶33; Galli OMTC Decl. ¶¶ 14-15).

32.     Lavine assured Plaintiff that it would not because, Lavine told her, the technology practice area of PwC did not have the subject matter knowledge or the experience to handle the advisory work handled by the RAS AML Advisory practice, an untrue statement. (See ECF #25 ¶34; Galli OMTC Decl. ¶¶ 10-11, 14-15).

33.     In reliance on this representation and assurances from Lavine and Stahlmann and not knowing about the DFS investigation, Galli electronically signed the EA and AA with PwC on June 11, 2014. (See ECF #25 ¶35; Galli OMTC Decl. ¶ 17).

34.     Because of the time pressure to get a significant amount of onboarding paperwork done, there was not even a suggestion by PwC should even consult with an attorney before signing.  (See Galli OMTC Decl. ¶ 17).

35.     PwC and Lavine knew, or should have known, of the DFS investigation and factual circumstances of a pending settlement because Lavine was a partner and the practice leader of the unit being investigated, and was also at the Firm at the time the wrongdoing occurred so he would have most definitely been potentially targeted by the investigation. (See ECF #25 ¶35; Galli OMTC Decl. ¶¶ 17-19).

36.     PwC, through Lavine and Stahlmann, continued to deceive Plaintiff for the next two months as Plaintiff was preparing to join PwC, while its settlement negotiations with the DFS were progressing. When Plaintiff did arrive at PwC on or about August 4, 2014, PwC still had not told her of the DFS investigation or imminent settlement. (See ECF #25 ¶36; Galli OMTC Decl. ¶ 19).

37.     Plaintiff learned of the investigation and the Settlement Agreement not through PwC, but through the media on or about August 18, 2014, when it became effective and public.  Plaintiff's first day on the job in the New York office after her initial two-week training was Monday, August 14, 2014. (See ECF #25 ¶37; Galli OMTC Decl. ¶ 20).

38.     Part of the Settlement Agreement with DFS included a provision that made all of the employees of the RAS practice, including Plaintiff, a subject to the Settlement Agreement. (See ECF #25 ¶38; Galli OMTC Decl. ¶¶ 22, 26).

39.     PwC agreed to a two-year ban that solely impacted the PwC RAS practice unit but no other practice areas of the firm.  This meant that RAS employees, including Plaintiff, would be hindered in their ability to do work for DFS-regulated banks. (See ECF #25 ¶38; Galli OMTC Decl. ¶ 21).

40.     The ban prohibited said employees from acting as independent consultants for DFS regulated banks or to have access to Confidential Supervisory Information ("CSI") for DFS-regulated clients for all new engagements. (See ECF #25 ¶38; Galli OMTC Decl. ¶ 21).

41.     Concerned about this material development, Galli approached Lavine to discuss whether she could be transferred to another practice area of the Firm. (See ECF #25 ¶38; Galli OMTC Decl. ¶¶ 21, 22).

42.     Plaintiff understood the potential implications of the sanctions being imposed against her and immediately requested a transfer but Lavine told her she could not be transferred, and that he would not do so because her name, without her knowledge or approval, had been submitted with others to the DFS as employees working in the RAS unit who would be bound by the sanctions, even though the vast majority of these individuals were not at the Firm when the fraudulent report was issued back in 2008. (See ECF #25 ¶39; Galli OMTC Decl. ¶¶ 21-26).

43.     Lavine said that the Firm might look bad in the eyes of the DFS and might question her transfer, if he were to do so. (See ECF #25 ¶39; Galli OMTC Decl. ¶ 23).

44.     Lavine's statement was also false as the Settlement Agreement itself suggests; there was no impediment in it to prevent PwC from moving her to another unit, particularly since she was a new employee with no nexus to PwC's sanctioned conduct. There was a provision in the Settlement Agreement providing for regular dialogue between PwC and DFS. (See ECF #25 ¶40; Galli OMTC Decl. ¶ 24).

45.     Galli was very concerned about the fact that she had not been told prior to joining the Firm about a very material regulatory development and that the submission of her name had been done without her prior knowledge and permission. (See ECF #25 ¶41; Galli OMTC Decl. ¶ 26).

46.     The personal association with a regulatory sanction of this nature is potentially very damaging to Galli personally because she now has to disclose it and explain that she had nothing to do with the sanctioned conduct.  Some potential employers/clients may not be interested in the explanation, and she would never have agreed to join the firm nor executed any EA or AA, if these facts had been transparent.  (See Galli OMTC Decl. ¶ 27).

47.     Lavine told her and other employees of the AML Advisory practice that they should not be concerned because it was only a two-year ban and that it did not pertain to assignments in place at the time of the ban. (See ECF #25 ¶41; Galli OMTC Decl. ¶ 27).

48.     Lavine also assured the team that there were enough projects at PwC which were exempt from the ban to carry the unit (and, therefore, the team) through its expiration in August 2016.  Based on those representations and assurances, Plaintiff continued in her job and proceeded to do everything reasonably asked of her. (See ECF #25 ¶42; Galli OMTC Decl. ¶ 27).

49.     Lavine's representations proved to be false, and Lavine, as the head of the unit, knew or should have known and assurances and guarantees were not honored. (See ECF #25 ¶42; Galli OMTC Decl. ¶ 28).

50.     This abstention imposed on RAS employees actually clearly impacted their ability to perform in that they were not able to receive sales credit for projects sold to DFS-regulated banks, if they were deemed ineligible to work on those projects, and were thus also unable to earn utilization credit.  (Both sales and utilization are key performance metrics that are used for some employees).  The sanctions also negatively impacted PwC's ability to win new work for DFS-regulated banks since we would be forced to operate under constraints that did not apply to our competitors.  (See Galli OMTC Decl. ¶ 28).

51.     Plaintiff asked PwC numerous times to provide her with a copy of what was sent to DFS, particularly the RAS Employee List,[12] and for PwC to seek to remove her name or at least cooperate in taking steps seeking to accomplish this, but PwC has refused to do so, telling her that the sanctions have expired and, as far as they are concerned, the matter is closed.  PwC has taken no responsibility for its bad behavior or how its voluntary abstention to conduct independent consulting work and accessing CSI personally impacted the ability of RAS employees to meet their sales and utilization objectives.  (See Galli OMTC Decl. ¶ 29).

52.     In fiscal year 2015, Plaintiff was rated a "high performer" and was pegged as a leadership champion for PwC's talent transformation process that it had rolled out in 2015. (See ECF #25 ¶43; PWC000027-PWC000028).

---

[12]   Pursuant to Footnote 5 of the Settlement Agreement, "Within 14 days, PwC will provide to the Department a list of RAS personnel and will provide an updated list every six months during the pendency of the abstention" (the Settlement Agreement is a matter of public record for which the Court may take judicial notice.  (See Galli OMTC Decl. ¶ 29, and related footnote).

53.     Plaintiff received her promised 2015 bonus in the amount of $100,000 but PwC overlooked her eligibility for a merit raise. (See ECF #25 ¶44; PWC000027-PWC000028).

54.     In 2015 there was also a metamorphic change in PwC's attitude toward older, qualified and age-protected professionals, especially of the female gender, like Galli who were singled out and disqualified from or removed from available projects in favor of less qualified, less experienced younger males.  (See Galli OMTC Decl. ¶ 31).

55.     In Spring 2015, about nine (9) months into its two-year ban imposed by DFS, PwC had registered PwC Advisory Services, LLC, a Delaware entity, as a company doing business in New York and later transferred all U.S. Advisory personnel into this entity without prior notice or explanation.[13] (See ECF #25 ¶46; Galli OMTC Decl. ¶¶ 16, 32).

56.     Employees were eventually told that they had been moved into a new legal vehicle, since their paychecks were now coming from a new company, but were never asked to re-execute employment agreements with the new employer entity. (See ECF #25 ¶46; Galli OMTC Decl. ¶ 33).

57.     In or about October 2015, while the sanctions were still in effect, PwC moved the AML Practice out of Risk & Regulatory Practice into a newly formed Financial Crime Unit ("FCU"). (See ECF #25 ¶47; Galli OMTC Decl. ¶ 34).

---

[13]  As a matter of public record, this LLC was formed under the laws of the State of Delaware in February 2014, while the DFS investigation of PwC was progressing and registered in the State of New York in April 2015.  PwC, which was a party and bound by the Settlement Agreement, never informed the DFS of the Firm's reorganization of the joint venture between the LLC and the AML technical unit; or the formation merger into the Fraudulent Crimes Unit.

58.     PwC also formed an internal "joint venture" between the FCU and the AML technology unit in the Risk Assurance line of service. (See ECF #25 ¶47; Galli OMTC Decl. ¶ 35).

59.     Plaintiff was, on several occasions, told by PwC's risk partners that she could not work on specific projects due to the two-year ban, and Lavine put her on other projects as an "investment" to win other work from a potential client, which typically meant she would not earn any credit for utilization or revenue generation. (See ECF #25 ¶48; PWC000028-PWC000032).

60.     She was also removed from or passed over for jobs in favor of younger male partners or disallowed from billing her time on other jobs so as not to negatively impact the margin on these projects. All of this is against PwC's policies. (See ECF #25 ¶49; PWC000028-PWC000032).

61.     In May of 2016, just prior to her annual review, Lavine asked her what her future plans were, suggesting that she might like to retire. She pushed back and told Lavine she had no intention of retiring early. (See ECF #25 ¶50; PWC000032-PWC000034).

62.     The results of Plaintiff's annual evaluation were not communicated to her until the end of July, nearly a month and a half late, and she was downgraded from a high-performer to a "needs improvement" rating which disqualified her from any bonus.  At this meeting, Lavine told her that he was sorry that he had to make this review about performance, but that is apparently the marching orders he was given after Galli indicated that she was not ready to retire, as she was several years shy of being eligible for social security benefits. (See ECF #25 ¶51; PWC000034).

63.     PwC requires its partners to retire at age 60, but it also appears that PwC is quietly extending this requirement to Managing Directors and Directors, without their agreement. Partners who retire at 60 do so with full health care benefits and a pension.  Managing Directors and Directors on the other hand, are treated as any other employee, and immediately lose their health care benefits and may or may not receive their severance benefits apparently at the whim of the PwC Plan trustees. (See ECF #25 ¶51; PWC000032-PWC000034).

64.     Galli's performance rating was based solely on utilization and revenue generation metrics, and did not, as was required by PwC's performance evaluation system, take into consideration any of the performance snapshots or other performance indicators which were all very good and other performance goals that Galli had attained throughout the year or any of the other initiatives that Plaintiff was leading on behalf of the practice, most of which had been assigned to her by Lavine. (See ECF #25 ¶52; PWC000033-PWC000034).

65.     This was also contrary to the assurances that Lavine had made when the DFS two-year ban was announced. (See ECF #25 ¶53; PWC000028-PWC000034).

66.     Lavine had indicated that the restrictions on RAS employees would not personally negatively impact them, but this was clearly not the case.  Galli went from being a "high performer" in 2015 to a "needs improvement" performer in May 2016, while the DFS ban was still in full force and effect. (See ECF #25 ¶53; PWC000028-PWC000034).

**Lavine's Communications**

67.     On January 26, 2017 Lavine, whom Galli had not seen for some time, requested that she come to his office for a meeting.  She obliged and started to update him on some of the proposals that had been outstanding prior to the holiday break.   (See ECF #25 ¶55; Declaration of Susan J. Galli for summary judgment motions ("Galli SJ Decl.") ¶¶ 5-6, 15).

68.     Lavine and Galli were the only ones present at the January 26, 2017 meeting. (Id.)

69.     During this meeting, Lavine interrupted her and told her that "he could no longer defend her", and that the Firm had been making cuts and that two of the female Directors in the RAS practice area would be departing at the end of February. (See ECF #25 ¶55; PWC0000006).

70.     Lavine indicated that some of the other male partners also wanted her to be on that list, but at no time at this meeting did Lavine state Plaintiff was being given Notice of a Covered Termination or that April 7th would be her last day at the firm. Lavine never used the word "termination" or "notice" and never even said or suggested a date. (See ECF #25 ¶56; Galli SJ Decl. ¶¶ 5-7, PWC000091).

71.     Lavine, instead, said he would like to have another meeting with Plaintiff and someone from PwC's Human Resources on February 1, 2017 to discuss things further before Plaintiff left for her planned vacation on February 10, 2017.   (See ECF #25 ¶57; Galli SJ Decl. ¶¶ 5-6; PWC000006-PWC000007).

72.     There is no record from Lavine which memorialized/or confirmed his discussions with Plaintiff in writing.  (See Administrative Record).

73.     Plaintiff reached out to Lavine via e-mail to confirm her February 1, 2017 meeting with him.  Plaintiff was at the office on the February 1, 2017 to attend the meeting, and later learned that Lavine was out of the country on business.  (See ECF #25 ¶58; Galli SJ Decl. ¶ 6).

74.     Galli heard nothing further from Lavine about possible termination, although she was obviously concerned that this could eventually occur since it was common knowledge that a number of other Managing Directors and Directors across the firm were being cut on a monthly basis.  Every month a few more would disappear without any kind of official notice about layoffs. (See ECF #25 ¶59; Galli SJ Decl. ¶ 6).

75.     Before returning from her vacation, Plaintiff was contacted by Stahlmann to advise her that Lavine had approved Plaintiff to work on a new project with a major global client that Plaintiff had helped to win and that, essentially, Plaintiff was the only subject matter specialist with the necessary business experience to carry out the project.  There was no discussion about an imminent departure. (See ECF #25 ¶60; PWC000007).

76.     PwC would not have been selected to do the work without Plaintiff's involvement.  Plaintiff figured that no news was good news, and continued to carry out her duties, as there was no further communication from Lavine to follow up on the January 26 meeting. (See ECF #25 ¶61; Galli SJ Decl. ¶ 9, PWC000006-PWC000007).

77.     Plaintiff and Stahlmann never spoke about "termination" and Stahlmann never revealed to her that she had been at a meeting with Lavine and others discussing a strategy to terminate her. (See ECF #25 ¶62; Galli SJ Decl. ¶¶ 9-10).

78.     Plaintiff was scheduled to work in Germany on the new project during the week of February 27, 2017, then to attend an industry conference in Florida.  (See PWC000006-PWC000007).

79.     On March 7, 2017, Galli spoke briefly with Stahlmann, at the conference in Florida.  Stahlmann, who had been with her in Germany the prior week or so, asked her how she was doing and inquired whether she had been in contact with Lavine.  Ms. Galli replied that she had not heard from him. (See ECF #25 ¶63; Galli SJ Decl. ¶ 9).

80.     Within hours of her having spoken to Stahlmann, she received a strange email from Stahlmann with no message but only an attachment of what looked like a draft letter that was unsigned and bearing the date February 27, 2017, which referred to an April 7 termination date.  That draft, or a final version of same, was never sent to or received by Galli from the author, nor did the author sign it. (See ECF #25 ¶64; Galli SJ Decl. ¶¶ 9-10).

81.     The draft letter had been composed by Calabrese, of Human Resources, and, on its face, was not factually accurate because Calabrese was not at the January 26, 2017 meeting, and, therefore, had no idea what was discussed at that meeting. (See Galli SJ Decl. ¶¶ 14-15).

82.     Calabrese also did not meet with Galli and Lavine on February 1, 2017, or at any other time to discuss the terms of a termination of Ms. Galli. (See ECF #25 ¶64; Galli SJ Decl. ¶¶ 14-15).

83.     The draft letter incorrectly stated that the terms outlined in the letter had been discussed when Galli met with Lavine on January 26th, which was not the case, and none of those details were ever discussed with Lavine, even when Galli met with him on April 4th. (See ECF #25 ¶65; Galli SJ Decl. ¶¶ 9-10, 14-15).

84.     Galli never received or saw the final version of that letter, only the draft when she received it from Stahlmann's iPhone. (See ECF #25 ¶66; Galli SJ Decl. ¶¶ 9-10, 14-15).

85.     Calabrese never sent a final, signed version of the letter to Galli. (See ECF #25 ¶67; Galli SJ Decl. ¶¶ 14-15).

86.     The next time Galli saw or heard from Lavine was on April 4, 2017 (three days before her actual termination) while they were both attending an industry conference, which Lavine also had asked Galli to attend, representing PwC. (See ECF #25 ¶68; PWC000007).

87.     Lavine appeared unaware, that Galli would have been attending the conference anyway, as she is a member of the Advisory Board for the conference organizer, and was speaking on number of panels at the conference. (See ECF #25 ¶68; Galli SJ Decl. ¶ 7).

88.     During her discussions with Lavine on April 4, 2017, Lavine never discussed or even raised a Notice Period (for severance pay purposes) or, for that matter, her Termination Date, although he did mention to her that if she were to decide to go out into business on her own, she would be free to do so, because the Firm would not seek to enforce the restrictive covenants in her Employment Agreement, whereas PwC would not like or be receptive to her working for another competitor firm. (See ECF #25 ¶69; PWC000007).

89.     These assurances provided by Lavine were not consistent with the Separation Letter received the following week, purportedly from Lavine.  Lavine also never responded to several emails that Galli sent to him trying to identify specifically which clients PwC felt were covered by the restrictive non-solicitation clause. (See ECF #25 ¶69; Galli SJ Decl. ¶¶ 9-17; PWC000007-PWC000008).

## I.     PwC NOTICE/SEVERANCE PLAN

90.     The PwC Notice/Severance Policy (the "Plan") purports to be a "welfare benefit plan" within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), meaning that it provides benefits to an "Eligible Employee" who experiences a "Covered Termination." (See ECF #25 ¶70; PWC000114).

91.     PwC is both the sponsor and Administrator of the Plan and delegates its administrative duties to certain designees.  "Administrator" is defined as PwC acting in its capacity as "administrator" within the meaning of Section 3(16) (A) of ERISA. (See ECF #25 ¶71; PWC000114, PWC000127-PWC000128).

92.     Section 1 of the Plan specifically states that the purpose of the Plan is to "provide Eligible Employees…with notice of, and/or severance pay upon termination by the Firm "for reasons other than professional, legal, ethical, or Firm policy violations." (See ECF #25 ¶72; PWC000114).

93.     Section 5 (a)(i) provides that "[e]ach Eligible Employee who incurs a Covered Termination shall receive such prior Notice Period…as specified in his or her Employment Agreement." [emphasis supplied]. (See ECF #25 ¶73; PWC000117).

94.     The "Notice Period" is defined in Section 2(g) of the Plan and means "the period, if any, of notice of a Covered Termination to which an Eligible Employee is entitled pursuant to Section 5(a)" of the Plan. (emphasis supplied). (See ECF #25 ¶74; PWC000115).

95.     The Plan defines "Covered Termination" as an Eligible Employee whose employment is terminated by the Firm for reasons other than professional, legal, ethical, or Firm policy violations. (See ECF #25 ¶75; PWC000116).

96.     Galli is an Eligible Employee, because at relevant times she was an employee of the Firm and was not one which falls within any of the nine exclusions listed in § 2(b) of the Plan. (See ECF #25 ¶76; PWC000114-PWC000117).

97.     Galli's dismissal is a "Covered Termination" under the Plan, because it was not the result of any professional, legal, ethical, or Firm policy violations by Galli herself (Plan, Sections 1 and 4(a)), and it does not fall within any of the specific exclusions in Plan Section 4(b)(i) through (iii). (See ECF #25 ¶77; PWC000114-PWC000117).

98.     Galli, who was employed by the Firm from August 4, 2014 through April 7, 2017 was entitled to a three months' Notice Period prior to her termination under Section 5 of the Plan. (See ECF #25 ¶78; PWC000114-PWC000117).

99.     Galli's dismissal is a "Covered Termination" under the Plan, because it was not the result of any professional, legal, ethical, or Firm policy violations by Galli herself (Plan, Sections 1 and 4(a)), and it does not fall within any of the specific exclusions in Plan Section 4(b)(i) through (iii). (See ECF #25 ¶79; PWC000114-PWC000117).

100.    The Plan provides in Section 6 that payment of severance benefits is to be made in a lump sum. But instead of receiving a lump sum of $105,000, less withholdings, PwC subsequently only paid her the equivalent of $31,907, representing her base pay for the period from April 7, 2017 through the last pay period of April 2017. (See ECF #25 ¶80; Galli SJ Decl. ¶ 17).

## II.     **PROCEDURAL FACTS**

101.    PwC hired Plaintiff as a Managing Director on August 4, 2014.   It terminated her from employment on April 7, 2017. Following her termination, Plaintiff received in the mail an unsigned letter dated April 7, 2017 confirming her termination and containing within it a proposed Agreement and General Release ("A & R") in favor of PwC, its subsidiaries, partners, principal, and employees ("Termination Letter"). (See ECF #25 ¶81; PWC000013-PWC000019).

102.    Galli sought advice of legal counsel, which the Termination Letter suggested she do before signing, and she ultimately refused to sign the proposed A & R in the Termination Letter on the grounds it lacked adequate consideration because she had numerous statutory and common law claims for damages against PwC, including some of its partners and/or principals; and because the A & R did not adequately provide her with the severance to which she was entitled under the PwC Severance Plan and attempted to place conditions on the severance payment. (See ECF #25 ¶82; Galli SJ Decl. ¶ 17).

103.    Although the Termination Letter made no mention of the PwC Severance Plan, it was transparent to Plaintiff that PwC was using the payment of benefits under the Plan as leverage, or a wedge, to obtain a full release from all possible wrongdoings, such as fraudulent inducement; intentional infliction of emotional distress; intentional interference with business opportunity through attempting to enforce a two-year non-solicitation by Galli of PwC's clients and employees and by defamation; and discrimination based on age and gender. (See ECF #25 ¶83; PWC000013-PWC000019).

104.    Payment of the full amount of severance referenced in the letter was contingent on signing the A & R. (See ECF #25 ¶84; PWC000013-PWC000019).

105.    In an effort, to try to intimidate her for refusing to sign the A & R, PwC was "slow walking" payment of her final authorized travel and entertainment expenses which caused her corporate credit card account to become delinquent, as well as not providing her with requested information about the PwC Notice/Severance Plan. (See ECF #25 ¶85).

106.    Galli had never been provided with a copy of the Plan, or even its Summary Plan Description, during the entire time she was employed by PwC, although the Policy had been mentioned in the EA she was required to sign on June 11, 2014 before joining the firm. (See ECF #25 ¶86).

107.    Plaintiff had asked Human Resources for a copy several times after her departure and was told that the Severance Plan was included in her employment letter. (See ECF #25 ¶86; PWC000009).

108.    PwC refused to respond to Plaintiff except through its local counsel. Thus Plaintiff hired counsel and obtained a copy of the Plan only after her attorneys demanded a copy of same from PwC. (See ECF #25 ¶87; PWC000009-PWC00010).

109.    Thereafter, Galli sought, through her attorneys, to resolve the dispute over payment of her severance under the Plan, including the exchange of extensive correspondence with PwC's counsel, setting forth the facts and circumstances of Galli's claims against PwC, to no avail. (See ECF #25 ¶88; Administrative Record; See also, Galli SJ Decl. ¶¶ 9-25).

110.    As to severance benefits, Galli provided PwC with extensive facts and circumstances supporting her claim that she had not received the requisite Notice of her Covered Claim and Notice Period under § 2(g) of the Policy. (See ECF #25 ¶89; Galli SJ Decl. ¶ 3, Galli OMTC Decl. ¶ 3).

111.    She did the same as to her other claims which formed the basis for a claim under §§ 5(c) and (d) of the Plan. (See ECF #25 ¶90; Galli SJ Decl. ¶ 3; Galli OMTC Decl. ¶ 3).

112.    PwC disregarded Plaintiff's submissions and asserted the alternate defense that Galli had "actual notice" of her impending termination, which PwC claims satisfied the "Notice Period" requirements in the Policy.  However, they failed to produce substantive evidence to support its position. (See ECF #25 ¶91; Galli SJ Decl. ¶ 3; Galli OMTC Decl. ¶ 3).

**Galli's Claim For Benefits**

113.    On January 18, 2018, Plaintiff's attorneys made a formal claim on her behalf, in two parts: (a) Policy § 5 (b) (Severance Pay in Lieu of Notice), and (b) §§ 5(c) (Firm's Discretion), and 5(d) (Limitation). (See ECF #25 ¶92; PWC000001-PWC000012 and referenced exhibits).

114.    In addition to the severance pay in lieu of the Notice Period claim, pursuant to the Policy's § 5 (b), Plaintiff requested supplemental benefits pursuant to Sections 5(c) and (d) of the Plan which permitted PwC, in its sole discretion, to make additional payments, over and above the "Pay" benefit defined in the Plan, for amounts totaling up to 200% of the Eligible Employee's total annual compensation for the year prior to the year of termination, in this case FY 2016. (See ECF #25 ¶93; PWC000001-PWC000012 and referenced exhibits).

115. The Plan provides that payments within PwC's discretion under Sections 5(c) and (d) can be made "in such form, at such times, and on such terms and conditions as the Firm may determine," *e.g.*, severance pay, notice, and/or benefits. This meant that Plaintiff, who was terminated on April 7, 2017, was eligible to receive discretionary payments in an amount in excess of $1,000,000, depending on the value of her benefits as a percentage of her annual "total compensation" for FY 2016. (See ECF #25 ¶94; PWC000114-PWC000122).

116. On April 11, 2018, Moore issued a decision summarily denying Galli's January 18, 2018 formal claim for benefits under the Plan. No decision was rendered by PwC or any Administrator or fiduciary pertaining to the claims made under Sections 5(c) and (d) of the Plan. These claims were simply ignored. (See ECF #25 ¶95; Galli SJ Decl. ¶ 22).

117. On June 6, 2018, Plaintiff's counsel filed an appeal from, and made a comprehensive request for documents and information, directed to Moore and to the Human Capital Operations Leader in Tampa Florida, as directed in the Policy in connection with, the Initial Determination and the appeal itself. (See ECF #25 ¶96; Galli SJ Decl. ¶ 23).

118. On June 29, 2018, PwC's counsel responded by sending only three documents in response to the requests, one of which appears to have been an incorrect IRS Form 5500 Annual Report for a different Policy. (See ECF #25 ¶97; Galli SJ Decl. ¶ 24).

119. On July 19, 2018, in response to Galli's June 6, 2018 request in the appeal for documents, the same counsel sent only a few additional documents, mostly incomplete emails to support the issue of whether Galli received a "Notice Period" of a "Covered Termination," as required in Section 2 (g) of the Plan. (See ECF #25 ¶98; Galli SJ Decl. ¶ 25).

120.    With the exception of one email dated January 31, 2017, which was out of context to support PwC's claim that notice of termination was given to Galli on January 26, 2017 which sufficed to satisfy the Plan, even though Galli had never seen the Plan prior to her termination.  The other emails produced were out of sequence (dated in March 2017).  In all, the production by the PwC Administrators was a small fraction of what had been requested. (See ECF #25 ¶99; Galli SJ Decl. ¶ 19).

121.    On August 2, 2018 Plaintiff and her counsel received a Final Determination Letter dated August 1, 2018 by Kovell, an employee of PwC in its Philadelphia, Pennsylvania office, which adopted and affirmed Moore's April 11, 2018 Initial Determination. In many respects, this Final Determination merely "rubber stamped" some of the summary findings in the Initial Determination, without reason or sufficient evidence, and those based on pure hearsay and incorrect information. (See ECF #25 ¶100; Galli SJ Decl. ¶ 20).

122.    The Final Determination was devoid of any evidence that Galli's claim received Notice of a "Covered Termination" under Section 2(g) of the Policy. (See ECF #25 ¶101; Galli SJ Decl. ¶¶ 20-21).

123.    As to the supplemental claim pursuant to §§ 5(c) and (d), it too was totally ignored by Kovell in the Final Determination, and did not make the slightest attempt to rectify the omission by Moore. (See ECF #25 ¶102; Galli SJ Decl. ¶ 20).

124.    There are no findings or reasons for the denial of the §§ 5(c) and (d) claim in either the Initial Determination or the Final Determination for such claim, based on fraudulent inducement, intentionally tortious acts, defamation, discrimination based on age and gender and

the like, as specified at length in correspondence between Galli's and PwC's attorneys. (See ECF #25 ¶103; PWC000154-PWC000158).

125.   The Final Determination confirmed that Plaintiff had exhausted her administrative remedies under the Policy and ERISA and that she had the right to bring an action to challenge the adverse benefit determination within six (6) months of receipt of his letter, which was incorrect. (See ECF #25 ¶104; PWC000154-PWC000158).

126.   By letter issued on or about January 25, 2019, Defendant Kovell corrected the Final Determination to state that Plaintiff has one year from receipt of his Final Determination Letter by which to commence an action challenging it. (See ECF #25 ¶105).

Dated:   New York, New York
         January 15, 2020                    ZEICHNER ELLMAN & KRAUSE LLP
                                             Attorney for Plaintiff Susan J. Galli


                                             _____
                                             WILLIAM T. MARSHALL, JR.