UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
SUSAN J. GALLI,                                             :
                                        Plaintiff,          :
                                                            :        19 Civ. 7224 (LGS)
            -against-                                       :
                                                            :        OPINION AND ORDER
PRICEWATERHOUSECOOPERS LLP                                  :
NOTICE/SEVERANCE POLICY AS                                  :
AMENDED AND RESTATED EFFECTIVE                              :
FEBRUARY 1, 2011, et al.,                                   :
                                        Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiff Susan Galli brings the following claims against Defendants[1]: failure to provide a

full and fair review of a claim under the Employee Retirement Income Security Act of 1974

("ERISA") § 503, 29 U.S.C. § 1133 (Count I); recovery of denied benefits under a plan under

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(A)(1)(B) (Count II); equitable relief for interference

with benefits under a plan under ERISA §§ 519 and 502(A)(3), 29 U.S.C. § 1140 (Count III);

breach of fiduciary duty under ERISA §§ 404-406 and 409, 29 U.S.C. §§ 1140-09 (Count IV);

and equitable relief for disclosure violations under ERISA § 502(A)(3), 29 U.S.C. § 1132(A)(3)

(Count V).  The parties cross move for summary judgment as to Count II.  Defendants also move

to compel arbitration of Counts I, III, IV and V.  For the following reasons, Defendants' motion

for summary judgment as to Count II is granted, Plaintiff's motion for summary judgment is

denied, and Defendants' motion to compel arbitration of the remaining claims is granted.

---

[1] Defendants are PricewaterhouseCoopers LLP Notice/Severance Policy as Amended and
Restated Effective February 1, 2011, PricewaterhouseCoopers LLP, Thomas Kovell, Courtney
Moore, PricewaterhouseCoopers Advisory Services, LLC, Jeffrey Lavine, Catherine Stahlmann,
Maria Calabrese and Cheryl Riporti.

## I.      BACKGROUND

All facts are undisputed unless otherwise noted.

### A.      The Employment and Arbitration Agreements

Plaintiff was employed by PricewaterhouseCoopers LLP ("PwC") as a Managing

Director between August 2014 and April 2017.  In June 2014, PwC sent Plaintiff a letter "setting

forth the terms of PwC's offer of employment" (the "Offer Letter"), attaching a proposed

employment agreement (the "Employment Agreement").  The Offer Letter includes the

following language:

> The terms of your employment are set forth in the Employment Agreement sent
> electronically (mail or wire) with this letter.  The Employment Agreement
> incorporates an Arbitration Agreement, under which you and the Firm mutually
> waive the right to a trial before a judge or jury in court in favor of arbitration for
> all Covered Claims (as defined in the Arbitration Agreement).

Similarly, the Employment Agreement includes the following language: "You and the Firm

agree, as a condition precedent to your employment, to be bound by the terms of the arbitration

agreement attached hereto as Exhibit A, which is incorporated herein by reference, and which

requires both you and the Firm to submit to final and binding arbitration all claims covered under

the arbitration agreement."  The Employment Agreement also provides that it "may be modified

only by a writing signed by the leader of your practice unit."

The Arbitration Agreement attached to the Employment Agreement includes the

following language:

> This Agreement requires both you and the Firm to resolve all Covered Claims (as
> described below) exclusively through final and binding arbitration.  This
> Agreement becomes effective on the first day of your employment with the Firm
> ("Effective Date") and survives and continues to apply following termination of
> employment. This Agreement is a mandatory condition of your employment with
> the Firm. Our employment offer is contingent upon, among other things, you
> electronically signing the Employment Agreement, which incorporates this

Agreement. **By electronically signing the Employment Agreement, you have accepted this Agreement, and you and the Firm are bound by its terms.**

The Arbitration Agreement defines "Covered Claims" as the following:

> Except as expressly set forth below, this Agreement shall apply to all disputes, controversies and claims relating to or arising out of your employment agreement or termination of that agreement, or your application for employment, offer of employment, prospective employment or employment with the Firm, or your separation from such employment . . . that you may have against the Firm . . . including those based on acts or omissions occurring prior to, on or after the Effective Date, which could otherwise be resolved by a court or administrative agency ("Covered Claims").  Covered Claims include, without limitation, claims under . . . the Employee Retirement Income Security Act . . . and . . . claims for breach of fiduciary duty. . . .

The Arbitration Agreement expressly excludes from the categories of claims subject to arbitration "[c]laims for benefits under [ERISA], which must be resolved in accordance with the terms and procedure set forth in the applicable plan documents."  The Arbitration Agreement also provides that the arbitrator "shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper parties to the Arbitration; such questions shall be reserved for a court of competent jurisdiction."

Plaintiff executed the Employment Agreement on June 11, 2014.

**B.      The Severance Plan**

As part of her employment, Plaintiff was subject to PwC's "Notice/Severance Policy" (the "Plan"), an ERISA welfare benefit plan administered and funded by PwC.  PwC is designated the Administrator under the Plan, with the power "to delegate responsibilities to others to assist in administering the Policy."

Under the Plan, as relevant to Plaintiff, a terminated employee "shall receive such prior Notice Period [of termination], if any, as is specified in his or her Employment Agreement."

Plaintiff's Employment Agreement provides for three months' notice of termination prior to her date of termination.  "Notice" is not defined under the Plan.

The Plan also provides that PwC may provide a terminated employee severance pay in lieu of notice, "in its sole and absolute discretion acting in its nonfiduciary capacity."  "Such severance pay shall be equal to the Pay the Eligible Employee would have received during the Notice Period had his/her employment not terminated, reduced by the Pay the Eligible Employee has already received for the Notice Period."

Finally, the Plan provides that, notwithstanding the above, PwC "may in its sole and absolute discretion (i) determine that payments under the [Plan] shall be based on amounts in addition to Pay as defined herein, and (ii) grant severance pay, notice and/or benefits under this Policy to designated Eligible Employees . . .  in such amounts, in such form, at such times and on such terms and conditions as the Firm may determine in its sole and absolute discretion" and that, "[n]otwithstanding any other provision of this [Plan], amounts payable under this [Plan] shall not exceed 200% of an Eligible Employee's total compensation from the Firm for the year prior to the year of termination of employment."

### C.    Plaintiff's Termination

On January 26, 2017, Plaintiff attended a meeting with Jeffrey Lavine, a partner at PwC. The parties dispute what was said at this meeting.  PwC asserts that Mr. Lavine gave Plaintiff notice of her termination.  Plaintiff asserts that Lavine did not give her such notice, but instead "told her that 'he could no longer defend her,'" "that the Firm had been making cuts and that two of the female Directors in [Plaintiff's practice group] would be departing at the end of February," and that he would like to have another meeting with Plaintiff and someone from PwC's Human

Resources on February 1, 2017, to discuss things further before Plaintiff left for her planned vacation on February 10, 2017.  The administrative record includes six emails or email chains, sent between the date of the meeting with Mr. Lavine and the date that Plaintiff was terminated, in which Plaintiff references her anticipated departure from PwC.  Most relevant is a January 31, 2017, email from Plaintiff emailed to Jeff Lavine and another PwC employee regarding a project about which Plaintiff wanted to connect, noting in the email that "I know it's moot for me since I'll be departing soon . . ."[2]

Plaintiff's employment at PwC was terminated effective April 7, 2017, ten weeks after her meeting with Mr. Lavine, and two weeks earlier than the mandated twelve week (or three month) notice period (assuming she received notice of termination at the meeting).  Plaintiff's base salary at the time of her separation was $420,000.

Plaintiff received a separation letter from PwC after her date of separation, consisting of a separation agreement.  A revised separation agreement was emailed to Plaintiff's counsel on April 26, 2017.  Both separation agreements were titled "Agreement and Release."  The revised separation agreement stated that Plaintiff "ha[s] already received nine (9) weeks' notice of the

---

[2] The administrative record also includes (1) an email on March 7, 2017, from Catherine Stahlmann to Plaintiff, attaching a letter from Maria Calabrese, Advisory FS Human Capital Manager, to Plaintiff, dated February 27, 2017, "confirm[ing the] conversation on January 26, 2017 with Jeffrey Lavine regarding [Plaintiff's] separation from employment at [PwC] effective April 7, 2017."; (2) an email on March 9, 2017, from Plaintiff to Maria Calabrese, stating, "I received the separation letter from Cathy," and asking questions regarding the logistics of leaving PwC; (3) an email on March 10, 2017, from Plaintiff to two PwC employees, stating that she was contacted about moderating a panel in May, but "I let them know that I will not be at PwC at that time . . ."; (4) an email on March 16, 2017, from Plaintiff to Jeff Lavine to "run by [him] the list of clients that [she] would be prohibiting from soliciting business from should I end up consulting in my next role pursuant to [the] employment agreement . . . I am following up with Maria on the other items that need to be wrapped up prior to my departure."; (5) an email on March 24, 2017, from Plaintiff to a gmail.com email address, noting "I am leaving the firm as of April 7."

Separation Date," and provided that, regardless of whether she signed the Agreement and Release, Plaintiff would receive a one-time payment of $31,907, pursuant to her Employment Agreement.  It also provided that, if Plaintiff signed the Agreement and Release, she would also receive a one-time payment of $73,096.00, equating to nine weeks' base salary.  Plaintiff did not sign either separation agreement.  Plaintiff received a payment of $31,907 following her separation, which equates to 3.6 weeks of salary.

### D.     Plaintiff's Claim for Benefits

Plaintiff's counsel submitted a claim for benefits under the Plan by letter dated January 18, 2018 (the "Claim Letter").  The Claim Letter asserted that Plaintiff did not receive notice of her termination until after her termination, and that she had not received the three months' severance pay to which she was therefore entitled under the Plan.  The Claim Letter sought an additional severance payment of $73,096, representing three months of Plaintiff's base salary ($105,000) less the payment of $31,907.  The Claim Letter also sought a $1 million payment under Sections 5(c) and (d) of the Plan "in consideration of, and as a 'trade-off' for (1) the amicable and full resolution of all other pending viable claims which [Plaintiff] has against PwC . . . and (2) PwC's enforcement or non-enforcement against [Plaintiff] of the restrictive covenants in her Employment Agreement over a period of two years, which she vigorously opposes."

The Claim Letter described the January 26, 2017, meeting with Mr. Lavine as follows:

Ms. Galli's conversation with Mr. Lavine, her Relationship Partner . . . consisted of Ms. Galli first mentioning to Mr. Lavine that two proposals, which PwC had been bidding on prior to the holidays, had not materialized.  Mr. Lavine replied to her that it really did not matter to him because he had been told that Advisory Management was looking to make additional (personnel) cuts by the end of February, and that he could "no longer defend" her.  He never defined or mentioned any specifies about precisely what this meant.  He also did not tell her that she was on any list to be cut in February, or in any way provide her with the required three

6

month Notice Period as required by the Plan . . . Mr. Lavine closed the meeting by specifically requesting that Ms. Galli meet with him and a representative from Human Resources . . . on February 1, 2017, at which time they could discuss her employment situation further, including the timing of any termination.

The Claim Letter further asserted that Plaintiff's email on March 15, 2017[3], referring to the April 7, 2017 termination date, was "taken out of context," and in any event "does not alter the uncontroverted fact that, for pay purposes and pursuant to the terms of her EA, she was never given a Notice Period or advised of any election of PwC's rights under the Plan."

     **E.**    **The Denial of Claims**

On March 27, 2018, Cheryl Riporti emailed Courtney Moore regarding Plaintiff's claim for benefits noting, *inter alia*, the following bullets as background:

- **1/26/17** – Jeff Lavine spoke with Susan. Discussed that last day would be 4/3/17, but approved to provide "internal notice in lieu of immediate termination with severance". Since Susan was participating in the ACAMS conference in Florida, they agreed separation would be delayed a few more days to 4/7/17. Jeff has an email from Susan following this conversation confirm her last day would be 4/7.
- **2/16/17** – Maria Calabrese sent Jeff Lavine an email on 2/16/17 with the separation letter, with last day indicated as 4/3/17 (HR was not aware Jeff extended to 4/7)
- **2/27/17** – Maria Calabrese emailed Jeff Lavine updated separation letter indicated 4/7/17 would be the actual last day worked.
- **3/7/17** – Upon follow-up by Maria, Catherine Stahlmann emailed separation letter to Susan Galli.

Ms. Moore created a document entitled "Susan Galli Notes" (the "Notes") in connection with the April 11, 2018, initial benefits determination. The Notes state that Ms. Moore's "primary role was to assess at what time [Plaintiff] was aware of her impending departure, and

---

[3] It's unclear to which email the Claim Letter is referring, as there are no emails dated March 15, 2017, in the administrative record.

whether it was before 2.8.17[4] (in which case no additional severance was required) . . ."  The

Notes reference the January 26, 2017, conversation between Plaintiff and Jeff Lavine, stating

"[c]onversation with Jeff Lavine- Jeff recalls having to chase [Plaintiff] for this conversation-

multiple texts, phone calls, etc. until it took place."  The Notes include the text of the January 31,

2020, email in which Plaintiff observes "FYI, I know it's moot for me since I'll be departing

soon . . ."  The Notes assert that "[t]he above email, coupled with Jeff Lavine, Cheryl Riporti and

Maria Calabrese's statements were evidence that [Plaintiff] knew of her impending departure on

or before January 31, 2017" and conclude that "no additional severance is required."

On April 11, 2018, PwC denied Plaintiff's request for benefits by letter from Ms. Moore,

Human Capital Operations, "[o]n behalf of the Policy Administrator."[5]  The letter states that Ms.

Moore was "delegated authority by [PwC] to review and decide certain claims for benefits under

the Policy" and asserts that "[a]fter reviewing [Plaintiff's] claims in accordance with Section 503

of ERISA and the Policy's claim procedures . . . [Plaintiff's] claims for benefits [are] denied."

The letter found that "[o]n January 26, 2017, Ms. Galli spoke in person with a firm Partner, Jeff

Lavine, regarding the termination of her employment," that -- between the notice period between

January 26, 2017, and April 7, 2017, and the payment of $31,907.00 provided to Plaintiff

---

[4] This date was identified based on the following: Plaintiff was paid $31,907.00, or 3.6 weeks of pay.  Since Plaintiff's Employment Agreement required twelve weeks of notice or severance in lieu of notice, Plaintiff would be owed additional severance pay if she was given less than 8.4 weeks, or fifty-nine days of notice.  Fifty-nine days prior to April 7, 2017, is February 8, 2017.
[5] The Administrative Record includes a document, dated March 29, 2018, entitled "Written Delegation of Fiduciary Authority under the PricewaterhouseCoopers LLP Notice/Severance Policy" in which Thomas Kovell, Human Capital Operations Leader, asserts that he, "in [his] capacity as designee under the PricewaterhouseCoopers LLP Notice/Severance Policy . . . pursuant to Section 7(a) of the Policy, and in accordance with Section 7(b)(iv) of the Policy, do hereby delegate fiduciary authority . . . to any Line of Service Human Capital Operations leader at [PwC] to hear, decide and adjudicate, in accordance with ERISA, initial claims brought pursuant to Section 7(c) of the Policy."

following her termination -- Plaintiff "was given a Notice Period (comprised of notice and severance in lieu [of] notice) of more than three months," and that "the Policy may pay benefits to a Policy participant only if permitted by the Policy."  The letter concluded that "[n]o further severance benefits are due to [Plaintiff] under the terms of the Policy."

   **F.    Plaintiff's Appeal**

   On June 6, 2018, Plaintiff appealed the denial of claims.  In relevant part, the appeal argues that any notice of termination must be in writing because "the Employment Agreement provides that any modification of its terms requires a 'writing,'" and notice of termination is a change to Plaintiff's employment status.  The appeal also argues in a footnote that "[n]o decision was rendered . . . pertaining to the claims made under Section 5(c) and (d) of the Plan . . . The time for the Administrator to do so has expired."

   Simultaneously with the appeal, Plaintiff's counsel submitted a "Request[] for Documents and Information Relevant to [Plaintiff's] Claims Under PwC's Severance Plan And Her Appeal From The April 11, 2018 Decision By Courtney K. Moore."  The request provided a list of 103 categories of documents and information to be provided to Plaintiff's counsel "within 5 business days of receipt of this request in order to establish and have available a complete administrative record for this appeal."  Counsel for PwC responded to the request in a letter dated June 29, 2018, providing documents responsive to request nos. 1, 3 and 7-9 and stating, "PwC is considering your voluminous litigation discovery-like requests, and will be providing additional documentation and information as appropriate."  An additional response, dated July 19, 2018, provided the emails between Plaintiff and other PwC employees between January 31, 2017 and March 24, 2017, described above, which were included in the administrative record as relevant to Plaintiff's subsequent claim for benefits; the email between Cheryl Riporti and

9

Courtney Moore from March 27, 2018; and the Notes that Courtney Moore created in connection with the April 11, 2018 initial benefits determination.

On August 1, 2018, PwC issued a final determination denying Plaintiff's claims by letter from Tom Kovell, National Human Capital Leader, "[o]n behalf of the Policy Administrator." The final determination found, based on a review of materials -- including the emails sent by Plaintiff following her meeting with Mr. Lavine and before her termination date, and an interview of several individuals including Mr. Lavine -- that Mr. Lavine had notified Plaintiff on January 26, 2017, that her employment was being terminated. The final determination further concluded, in relevant part, that "verbal notice of termination is sufficient under the Employment Agreement and the Policy" because Section 5(a) of the Employment Agreement governs notice of termination and provides that such notice is "subject to the Firm's Notice/Severance Policy," and "neither the Policy nor the Employment Agreement specifies a particular method or means of notice." This conclusion was reached by "appl[ying] the plain English meaning of notice, i.e., notification of an employee by [PwC] of the employee's forthcoming separation." The final determination further asserts that "verbal notice is [PwC's] typical practice."

## II.  SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a genuine dispute as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *accord Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017). "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment.  Factual disputes

that are irrelevant or unnecessary will not be counted."  *Liberty Lobby*, 477 U.S. at 248; *accord*

*Saleem v. Corp. Transportation Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

      The court must construe the evidence in the light most favorable to the nonmoving party

and must draw all reasonable inferences in favor of the nonmoving party.  *Liberty Lobby*, 477

U.S. at 255; *accord Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).  When considering a

cross-motion for summary judgment, the court "must evaluate each party's motion on its own

merits, taking care in each instance to draw all reasonable inferences against the party whose

motion is under consideration."  *Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y.*

*& Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d

Cir. 2002); *accord Llewellyn v. Asset Acceptance*, LLC, 669 F. App'x 66, 67 (2d Cir. 2016)

(summary order).  When the movant has properly supported its motion with evidentiary

materials, the opposing party may establish a genuine issue of fact only by "citing to particular

parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "[A] party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original); *accord*

*Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018).

      **B.**      **Standard of Review of the Plan Administrator's Decision**

      ERISA provides a beneficiary with a cause of action "to recover benefits due to him

under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his

rights to future benefits under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).  Federal courts

review a Plan Administrator's denial *de novo* "'unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan,' in which case an arbitrary and capricious standard applies."  *Halo v. Yale Health Plan, Dir. Of Benefits & Records Yale Univ.*, 819 F.3d 42, 51 (2016) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *accord Cohen v. Liberty Mut. Grp. Inc.*, 380 F. Supp. 3d 363, 376 (S.D.N.Y. 2019).

Here, the Plan affords the administrator discretionary authority to construe the Plan's terms.  According to the following provision relating to the powers and duties of the Administrator:

> The Administrator (and its designees) shall have full, complete and exclusive discretionary authority to interpret the Policy and to make any determinations related to the administration of the Policy to the maximum extent permitted by law, including, without limitation, the power and authority:
> (i) to supply omissions from, correct deficiencies in, or resolve inconsistencies or ambiguities in the language of the Policy;
> (ii) to determine all questions of fact arising under the Policy, including questions as to eligibility for, and the amount of notice and/or severance pay in lieu of notice[.]

The Plan's express grant of discretionary authority to the administrator dictates review under the arbitrary and capricious standard.  *See Ocampo v. Bldg. Serv. 32B-J Pension Fund*, 787 F.3d 683, 690 (2d Cir. 2015).

Under the "arbitrary and capricious" standard of review, the plan administrator's denial of benefits may be overturned "only if it is found to be without reason, unsupported by substantial evidence or erroneous as a matter of law," *id.* at 690 (quotation marks omitted), or "where [a] plan administrator or fiduciary has imposed a standard not required by the plan's provisions, or interpreted the plan in a manner inconsistent with its plain words."  *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (quotations and brackets omitted); *accord Fisher v. Aetna Life Ins. Co.*, No. 15 Civ. 283, 2020 WL 2792994, at *11 (S.D.N.Y. May 29, 2020).  "Substantial evidence is such evidence that a reasonable mind might

accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003) (alterations and quotation marks omitted). The arbitrary and capricious standard is "highly deferential, and the scope of judicial review is narrow." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 211 (2d Cir. 2015) (quotation marks omitted).

Despite this authority, "a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Halo*, 819 F.3d at 58. Plaintiff argues that *de novo* review is appropriate because the Plan administrator's decisions violated 29 C.F.R. § 2560.503-1(g)[6] by failing to respond adequately to Plaintiff's claims for benefits under Sections 5(c) and (d) of the Plan, pursuant to which Plaintiff made claims for up to $1,000,000 in benefits in consideration for signing a general release of "all other pending viable claims" against PwC and "PwC's enforcement or non-enforcement against [Plaintiff] of the restrictive covenants in her Employment Agreement over a period of two years, which she vigorously opposes."[7] This argument is unpersuasive because the Plan's initial determination addresses Plaintiff's

---

[6] 29 C.F.R. § 2560.503-1(g) provides, in relevant part, that "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination . . . [that] set[s] forth, in a manner calculated to be understood by the claimant— (i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based . . ."

[7] Plaintiff also argues that Plaintiff's separation letter was itself an adverse benefit determination because "it was an attempt to reduce her benefits under a Plan for which she never received a Summary Plan Decision." This argument is incorrect because it is counter to the terms of the Plan, which requires employees to make claims if they believe they are entitled to benefits they have not received, following which such claims will be approved or denied. Plaintiff also cites no legal authority in support of the argument.

claim in its entirety and states that Plaintiff's "claim for benefits is denied," identifies the relevant

Plan provisions and evidence on which that decision is based, and concludes, "[i]n summary,

[Plaintiff] was provided with the Notice Period in accordance with Section 5 of the Policy.  No

further severance benefits are due to [Plaintiff] under the terms of the Policy."  Notably,

Plaintiff's $1,000,000 claim under Sections 5(c) and (d) is contingent and prospective; in

substance Plaintiff agrees to provide a general release and to forego challenging the non-compete

provision, if PwC pays her $1,000,000.  The claim was essentially a counteroffer to PwC's offer

to pay Plaintiff nine weeks base salary if she signed the separation Agreement and Release.  Any

payments under Sections 5(c) and (d) are expressly payable "in such amounts, in such form, at

such times and on such terms and conditions as [PwC] may determine in its sole and absolute

discretion."  In these circumstances, the explanation provided in the initial determination is

sufficient.  To the extent the explanation is faulted for omitting that PwC declined to exercise its

discretion to make any additional payments under Sections 5(c) and (d), such omission was

harmless and inadvertent under *Halo*, 819 F.3d at 58, since that explanation is at least implicit in

the statement that "[n]o further severance benefits are due to [Plaintiff] under the terms of the

Policy."

Plaintiff also asserts in a conclusory fashion that Defendants failed to comply with 29

C.F.R. § 2560.503-1(h)[8] and § 2560.503-1(b)(5)[9] because the Administrator failed to provide

_____

[8] 29 C.F.R. § 2560.503-1(h) requires, in relevant part, "a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination," and that the procedure "[p]rovide claimants the opportunity to submit written comments, documents . . . and other information relating to the claim for benefits" and provide "a claimant . . . upon request . . . reasonable access to . . . all documents, records, and other information relevant to the claimant's claim for benefits . . ."

[9] 29 C.F.R. § 2560.503-1(b)(5) requires that claims procedures "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in

requested documents and information or to consider Plaintiffs' "issues raised," and "deviated

from the Plan by seeking a release of [Plaintiff's] claims in exchange for Plan benefits."  Plaintiff

fails to identify in her motion papers any relevant documents[10] that PwC failed to produce,

beyond her broad reference to the 103 requests for documents and information submitted to PwC

by Plaintiff's counsel simultaneously to Plaintiff's Appeal, and to a request for documents sent

on July 30, 2019.  Here, prior to ruling on Plaintiff's appeal, PwC provided to Plaintiff all of the

documents in the administrative record, except documents already in Plaintiff's possession or

provided to Plaintiff on an earlier date, specifically correspondence between the parties and the

Offer Letter, Employment Agreement, Arbitration Agreement and the Plan documents.[11]  This is

sufficient to satisfy the regulation.  *See Russo v. Cont'l Cas. Co.*, No. 05 Civ. 5700, 2006 WL

931683, at *5 (S.D.N.Y. Apr. 11, 2006), *aff'd*, 214 F. App'x 7 (2d Cir. 2007) (finding "all

pertinent records were provided to the plaintiff and he was not denied a full and fair review"

where the plaintiff was sent "a complete copy of the administrative record").  PwC's decision to

offer additional severance pay in exchange for Plaintiff's waiver of future claims against PwC is

not in conflict with the terms of the Plan, which provides for discretionary payments under

---

accordance with governing plan documents and that, where appropriate, the plan provisions have
been applied consistently."

[10] 29 C.F.R. § 2560.503-1(m)(8) states that a document, record or other information shall be
considered "relevant" to an administrative claim if it was "relied upon in making the benefit
determination;" "submitted, considered, or generated in the course of making the benefit
determination, without regard to whether such document, record, or other information was relied
upon in making the benefit determination;" or "[d]emonstrates compliance with the
administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in
making the benefit determination."

[11] The Plan and Summary Plan Document were provided to Plaintiff on April 26, 2017.  The
Written Delegation of Fiduciary Authority was provided to Plaintiff on June 29, 2018.  The Offer
Letter, Employment Agreement and Arbitration Agreement were provided when Plaintiff
commenced her employment with PwC.

Sections 5(c) and (d) as discussed above.  Indeed, Plaintiff herself made the same offer, albeit for a greater amount, stated as a "claim" under the same provisions.

Finally, Plaintiff does not explain how the Administrator failed to consider "issues raised" by Plaintiff beyond broadly asserting that the Plan administrator's decisions "ignored the comprehensive information supplied by Plaintiff and did not consider several of her arguments." This argument is also rejected.[12]  For all of the foregoing reasons, the Plan adminsitrator's denial of benefits is reviewed under the "arbitrary and capricious" standard of review.

### C.    Plaintiff's Motion for Summary Judgment

Plaintiff's argument for summary judgment on the denial of benefits claim (Count II) is that she did not receive *written* notice of her termination prior to her separation from PwC, and is therefore entitled to three months' severance pay under the Plan.  She asserts that the Plan requires written notice of termination because the Plan "work[s] in tandem" with the Employment Agreement; the Employment Agreement provides that it "may be modified only by a writing signed by the leader of your practice unit . . ."; and termination is a modification of the Employment Agreement because it changes Plaintiff's status from employee to non-employee. This argument is unpersuasive, and Plaintiff's motion for summary judgment is denied.

---

[12] Plaintiff repeatedly uses the phrase "for the reasons stated in [Plaintiff's] papers and herein" when making these arguments.  To the extent that Plaintiff is referring to legal arguments made in Plaintiff's declarations or Rule 56.1 statement and response, those documents are not appropriate vehicles for making legal arguments, and the Court declines to consider them.  *See* Local Civil Rule 7.1 (providing that legal argument is to be set forth in a memorandum of law, while factual affirmations are to be set forth in affidavits); *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 465 n.3 (E.D.N.Y. 2012) ("The Veliquette affidavit is riddled with legal argument.  Placing legal argument in an affidavit is plainly improper . . ."); Local Civil Rule 56.1 (providing that Rule 56.1 statements shall be "separate, short and concise statements" of "material facts"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (declining to consider legal arguments and conclusions in Rule 56.1 Statement).

When a plan is construed in ERISA cases involving claims under § 1132(a)(1)(B), courts interpret the plan according to "federal common law," which is "largely informed by state law principles." *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 352-53 (2d Cir. 2003); *see also Stets v. Securian Life Ins. Co.*, No. 17 Civ. 09366, 2020 WL 1467395, at *5 (S.D.N.Y. Mar. 25, 2020) (opining that, when determining an ERISA plan's requirements, the "ERISA plan documents 'must be interpreted according to ordinary principles of contract law'"). Applying these principles, the "Court will review the Plan as a whole, giving terms their plain meanings." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *see also Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) ("We interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience."). Courts first look to determine if the Plan's terms are ambiguous. *See O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994); *accord Verdier v. Thalle Constr. Co., Inc.*, No. 14 Civ. 4436, 2017 WL 78512, at *4 (S.D.N.Y. Jan. 5, 2017), *aff'd*, 771 F. App'x 20 (2d Cir. 2019). "Whether ERISA plan language 'is ambiguous is a question of law that is resolved by reference to the contract alone.'" *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 244 n.6 (2d Cir. 2007) (quoting *O'Neil*, 37 F.3d at 59); *accord Verdier*, 2017 WL 78512, at *4. "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Strom*, 497 F.3d at 244 n.6 (internal quotation marks omitted); *accord Verdier*, 2017 WL 78512, at *4.

The Plan does not define notice, and the word "notice" by its plain meaning is not restricted to written notice. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/notice (last visited Aug. 10, 2020) (defining notice as "warning or

17

intimation of something"); *see also Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) ("[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  (alterations in original) (internal quotations mark omitted)).  An additional requirement that the termination notice be in writing should not be written into the Plan.  *See Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 12 (1st Dep't 2015) ("a court should 'not write into a contract conditions the parties did not include by adding or excising terms under the guise of construction . . . .'" ); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199–200, 764 N.E.2d 958 (2001) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.").  Accordingly, Mr. Lovall's finding, acting on behalf of the Plan Administrator, that "notice" as defined under the Policy is not restricted to written notice based on "the plain English meaning of notice" is consistent with New York state law and federal common law principles.

Plaintiff's argument that the Plan must be read "in tandem" with the Employment Agreement, and that the Employment Agreement requires written notice, is rejected for two reasons.  First, the Plan does not refer to the Employment Agreement for the definition of notice, but only for the length of the notice period.  The Employment Agreement provides that notice will be provided "subject to" the Plan, not the reverse.  Plaintiff's argument that the Employment Agreement's requirement of a writing should be incorporated in the Plan is thus inconsistent with the plain language of the Plan and the Employment Agreement.

Second, the Employment Agreement's provision that it "may be modified only by a writing" is not triggered by Plaintiff's termination.  Contrary to Plaintiff's argument, termination does not require modification of the Employment Agreement because the Employment

Agreement expressly provides for "Employment-at-Will," pursuant to which "the Firm may change the terms and conditions of the employment relationship, and that you may leave the Firm, or the Firm may require you to leave its employ, for any reason or no reason, at any time."

Summary judgment is accordingly denied to Plaintiff because, based on the unambiguous terms of the Plan, written notice of termination is not required.

### D.    Defendants' Motion for Summary Judgment

Defendants cross-move for summary judgment on Count II, the denial of benefits claim. Summary judgment is granted to Defendants because the Plan administrator's decision that Plaintiff is not entitled to further benefits was not arbitrary and capricious. No reasonable jury could find that the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Ocampo*, 787 F.3d at 690.

The principal issue on Defendants' motion is whether Plaintiff received notice of termination at the January 26, 2017, meeting with Mr. Lavine. The Plan administrator concluded that Plaintiff had received such notice and denied benefits on that basis. This result was based on two findings: first, that the Plan's provision for notice of termination does not require written notice; and second, as a factual matter, that Plaintiff had received verbal notice of termination at the Lavine meeting. As discussed in detail above, Defendants' interpretation of the Plan was reasonable and based on the plain language meaning of the word "notice."

Defendants' factual finding that Plaintiff received verbal notice at the Lavine meeting is supported by "[s]ubstantial evidence [i.e.,] evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and . . . more than a scintilla but less than a preponderance." *Celardo*, 318 F.3d at 146 (alterations and quotation marks omitted). Defendants' denial of Plaintiff's claim, both initially and on appeal, was based on, *inter alia*, (1)

19

a conversation with Mr. Lavine, presumably reporting what had transpired at his January 26, 2017, meeting with Plaintiff; and (2) a review of certain emails, including an email sent on January 31, 2020 in which Plaintiff observes "FYI, I know it's moot for me since I'll be departing soon . . ."  Applying an arbitrary and capricious standard of review, no reasonable jury could find that that Defendants' factual finding -- that Plaintiff received notice of termination on January 26, 2017 -- was unsupported by substantial evidence.  Defendants' motion for summary judgment is granted.  *See Roganti*, 786 F.3d at 212 ("[I]n cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator.").

Plaintiff argues that she has created a genuine issue of disputed fact through her submission of a declaration attesting, *inter alia*, that the January 31, 2017, email was referring to something other than a notice of termination from Mr. Lavine.  This argument is unpersuasive for two reasons.  First, as Plaintiff's declaration is not part of the Administrative Record, it is not appropriately considered by the Court.  *Halo*, 819 F.3d at 60.  While a court may exercise its discretion to admit additional evidence for "good cause," *see id.*, Plaintiff waived her argument that the Court should admit evidence outside of the Administrative Record by failing to make it in her opening motion or opposition to Defendant's motion.  *See Crescent Beach Club LLC v. Indian Harbor Ins. Co.*, No. 18 Civ. 5951, 2020 WL 3414697, at *20 n.20 (E.D.N.Y. June 22, 2020) ("Arguments may not be made for the first time in a reply brief." (quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)).

Second, even considering Plaintiff's declaration as conflicting evidence does not render the denial of benefits arbitrary and capricious.[13]  Without or without the declaration, Defendants relied upon "more than a scintilla of evidence" in finding that Plaintiff received verbal notice of termination at the Lavine meeting.  *See Celardo*, 318 F.3d at 146.  Considering the evidence as a whole, this at best for Plaintiff creates a situation of equipoise.  The weight of the evidence does not tip "so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator."  *Roganti*, 786 F.3d at 212.

## III.   MOTION TO COMPEL ARBITRATION

### A.   Standard

In deciding a motion to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).  Courts must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on

---

[13] Plaintiff's declaration is considered only for purpose of argument and not because she has shown a conflict of interest on the part of the Plan administrator that warrants such consideration as a matter of law.  In *Durakovic v. Building Service 32 BJ Pension Fund*,

> the Second Circuit identified several types of evidence that might lead a court to more heavily weight a conflict: (1) a history of biased claims evaluation; (2) unreasonably relying on some evidence that aligns with an administrator's interests, to the detriment of other more detailed evidence, without further investigation; (3) behaving deceptively toward the benefits applicant; and (4) taking seemingly inconsistent positions that were both financially advantageous.

*Cohen v. Liberty Mut. Grp. Inc.*, 380 F. Supp. 3d 363, 380–81 (S.D.N.Y. 2019) (quoting *Durakovic*, 609 F.3d at 140 (internal quotation marks omitted)).  None of these factors exist here, there is no indication that the conflict or the identified purported examples of bias actually affected the decision to deny Plaintiff's claim for benefits or the compilation of the administrative record itself, and Plaintiff's broad accusations of bias are not supported by the administrative record or the decisions themselves.  *Cf. Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 218 (2d Cir. 2015) (stating that the burden was on the claimant to identify evidence that the committee's categorical conflict of interest "actually affected the administrator's decision.").

file, together with . . . affidavits," and must "draw all reasonable inferences in favor of the non-moving party." *Id.*

The Federal Arbitration Act ("FAA") embodies a national policy favoring arbitration based on the desire to preserve the parties' ability to arbitrate, not litigate, their disputes. *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015); *accord Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 215 (S.D.N.Y. 2019). In determining whether an action is arbitrable, a court must consider (1) whether the parties agreed to arbitrate and, if so, (2) whether the scope of the arbitration agreement encompasses the claims at issue. *Holick*, 802 F.3d at 394; *accord Coscarelli*, 364 F. Supp. 3d at 215.

### B.   Discussion

Plaintiff does not dispute that she signed the Employment and Arbitration Agreements, or that the Employment and Arbitration Agreements require arbitration of Counts I, III, IV and V. Instead, Plaintiff argues that the Employment and Arbitration Agreements were executed as a result of fraudulent inducement, are accordingly invalid, and therefore cannot bind Plaintiff to arbitration. In so doing, Plaintiff relies upon the "savings clause," of the FAA, which provides in relevant part that "a contract . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Plaintiff's argument is rejected, and Defendant's motion to compel arbitration is granted.

The Supreme Court observed, with respect to the savings clause, that:

Challenges to the validity of arbitration agreements . . . can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate.

> The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) (internal citations omitted). It further held that, because "an arbitration provision is severable from the remainder of the contract," "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-46; *accord Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012).

Here, there exists an Employment Agreement and an Arbitration Agreement. Plaintiff argues that Defendants fraudulently induced Plaintiff "to leave her employment at a large bank and to sign the [Employment and Arbitration Agreements]," and "continued to use them as elements of a fraud-based culture." Specifically, Plaintiff attests in a declaration in support of her opposition to Defendants' motion to compel arbitration that she was recruited and hired to work at PwC during an investigation of PwC by the New York State Department of Financial Services, which resulted in a Settlement Agreement, a fine and certain sanctions, but these facts were not disclosed to her by PwC, nor was it explained to Plaintiff how these events could negatively affect Plaintiff personally. Had Plaintiff known of this regulatory matter, she states, she would not have signed either the Employment Agreement or the Arbitration Agreement. Plaintiff's argument -- that Plaintiff's Employment Agreement and attached Arbitration Agreement as a whole are rendered invalid by the purported fraudulent inducement to accept PwC's offer of employment -- falls into the second category of challenge identified by *Buckeye*, and must therefore be decided by the arbitrator. *See Buckeye Check Cashing, Inc.*, 546 U.S. at 446 (holding that "because respondents challenge the Agreement, but not specifically its

arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court.").

Plaintiff argues that the circumstances of this case are distinguishable from *Buckeye* and its progeny because the Arbitration Agreement provides that the Arbitrator "shall not have the authority to decide jurisdictional or arbitrability disputes, including disputes over the . . . validity . . . of the agreement under which Arbitration is sought . . .; such questions shall be reserved for a court of competent jurisdiction."  Plaintiff is incorrect.  This provision removes the Arbitrator's authority to decide disputes over the validity "of the agreement under which Arbitration is sought," i.e. the Arbitration Agreement.  But, as established above, Plaintiff's challenge is not "specifically [to] the validity of the agreement to arbitrate," *Buckeye Check Cashing, Inc.*, 546 U.S. at 444, but is instead a challenge to her employment and all related contractual agreements. Accordingly, the Arbitration Agreement is "severable," *id.*, from the Employment Agreement, and "[t]he challenge should therefore be considered by an arbitrator, not a court."  *Id.*

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment as to Count II is GRANTED and Plaintiff's cross motion for summary judgment is DENIED.

Defendants' motion to compel arbitration of the remaining claims is GRANTED.

The Clerk of Court is respectfully directed to close the motion at Docket No. 42.

Dated: August 11, 2020
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE